Filed 7/9/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DEMETRIUS CRUMP et al., | B292786 |
| Petitioners, | |
| v. | (Los Angeles County Super. Ct. App. Div. No. BR053255; Los Angeles County Super. Ct. No. 6SC00433) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| THE PEOPLE et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Patti Jo McKay, Tony L. Richardson, and Sanjay T. Kumar, Judges; Alan S. Rosenfield, Judge. Petition denied in part and granted in part with directions.

Grignon Law Firm, Margaret M. Grignon, Anne M. Grignon; Brentford Ferreira; Parris Law Firm, R. Rex Parris, Patricia K. Oliver; Panish Shea & Boyle, Brian Panish and Robert Glassman for Petitioners.

Mariam El-Menshawi, Victims of Crime Resource Center, for The National Crime Victim Law Institute as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Jackie Lacey, District Attorney, Phyllis C. Asayama and Cassandra Thorp, Deputy District Attorneys, for Real Party in Interest The People of the State of California.

Morgan, Lewis & Bockius, James J. Dragna, David L. Schrader, Yardena Zwang-Weissman, Thomas M. Peterson, Nathan Hochman; Latham & Watkins and Manuel A. Abascal for Real Party in Interest Southern California Gas Company.

## SUMMARY

This case has its origin in a leak of natural gas from a Southern California Gas Company (SoCalGas) storage facility in Aliso Canyon, adjacent to the residential community of Porter Ranch, that began on October 23, 2015. The gas leak continued for months, causing damage to thousands of residents of the area, and generated a great deal of litigation. In addition to civil lawsuits brought by affected residents and businesses, the District Attorney for Los Angeles County filed a misdemeanor criminal complaint against SoCalGas (defendant).

The resolution of the criminal charges by a plea agreement generated further litigation by residents of the Porter Ranch community (petitioners here). In the plea agreement, defendant pleaded no contest to a charge of failure to immediately report the release of a hazardous material, and obtained dismissal of other charges, including a count alleging the discharge of air contaminants. Petitioners, numbering more than 7,000, sought to set aside the plea agreement and obtain restitution under the California Constitution, which gives victims the right "to seek and secure restitution from the persons convicted of the crimes causing

the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) At the sentencing hearing, the trial court considered petitioners' written submissions, oral argument and testimony, but denied their motion to vacate the plea and require restitution. Further litigation in the Appellate Division of the Superior Court was likewise unsuccessful, leading to a petition for writ of mandate in this court.

We hold that the Victims' Bill of Rights in the California Constitution (art. I, § 28), as amended in 2008 by Proposition 9 (Marsy's Law or section 28) does not authorize a victim to appeal from a judgment or order in a criminal case. Section 28 *does* require the court in every case to order restitution to crime victims "from the persons convicted of the crimes causing the losses they suffer." (*Id.*, subd. (b)(13)(A).) And section 28 *does* authorize a victim to enforce the right to seek and secure restitution (along with many other enumerated rights) "in any trial or appellate court with jurisdiction over the case as a matter of right," and further requires the court to "act promptly on such a request." (*Id.*, subd. (c)(1).) But nowhere does section 28 state or imply, nor does its history suggest, that a victim may enforce his or her right to restitution by direct appeal from a criminal judgment or order.

Instead, in those rare cases where the trial court fails in its duty to order restitution from the convicted wrongdoer to the victims of the crime, the victims may do what petitioners have done in this case: seek a writ of mandate. This is consonant with section 28, and at the same time does not interfere with "the public prosecutor's exclusive discretion in the conduct of criminal cases." (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451 (*Dix*).)

Here, however, the trial court did not fail in its duty when it refused to order restitution for all losses caused by the gas leak. We reject the contention that the release of air contaminants was "encompassed in" the reporting failure of which defendant was

convicted. We also decline to extend the right to restitution to dismissed charges that are "transactionally related" to the crime of which defendant was convicted. And although we find no error in the trial court's conclusion that there was no evidence or proffer of evidence to establish that defendant's failure to report the gas leak for three days was a substantial factor in causing the harm victims suffered from the gas leak, for the reasons set out below we do remand for a hearing on whether petitioners can prove damages from the three-day delay in reporting the leak, as charged in the criminal complaint.

We note as well that no injustice results from any of the legal conclusions we have reached. Petitioners continue to have recourse against defendant in numerous pending civil suits and class actions, in a civil court specifically designed to handle complex proceedings.

## FACTS

### 1. The Background and the Criminal Complaint

SoCalGas owns a massive natural gas storage field in Aliso Canyon, near the Porter Ranch community. On October 23, 2015, a leak of natural gas began from a well at the Aliso Canyon facility. The leak continued for months, and was finally successfully controlled in February 2016.

On February 2, 2016, the district attorney filed a misdemeanor criminal complaint against defendant, alleging violations of the Health and Safety Code and other state and county regulations. There were four counts.

Count 1 alleged that, from October 23 to October 26, 2015, defendant failed to report the release of hazardous material, in violation of Health and Safety Code section 25510, subdivision (a),

4

"to the California Emergency Management Agency and to the unified program agency."[1]

Counts 2 and 3 alleged failures to report the release of hazardous material, during the same period, under Los Angeles County Code section 12.56.030 and title 19 of the California Code of Regulations.

Count 4 alleged that, from October 23, 2015 to the present (February 2, 2016), defendant committed the crime of discharge of air contaminants, in violation of Health and Safety Code section 41700, subdivision (a), by discharging natural gas or its components.[2]

A few days after the complaint was filed, attorneys representing many of the victims of the discharge notified the district attorney's office that they sought restitution.

---

[1] Health and Safety Code section 25510 provides in pertinent part: "[T]he handler or an employee, authorized representative, agent, or designee of a handler, shall, upon discovery, immediately report any release or threatened release of a hazardous material, or an actual release of a hazardous substance, . . . to the UPA [unified program agency], and to the office, in accordance with the regulations adopted pursuant to this section." (*Id.,* subd. (a).) The term "office" means the Office of Emergency Services. (§ 25501, subd. (o).) The UPA in this case was the Los Angeles County Fire Department.

[2] Health and Safety Code section 41700 states that "a person shall not discharge from any source whatsoever quantities of air contaminants or other material that cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or that endanger the comfort, repose, health, or safety of any of those persons or the public, or that cause, or have a natural tendency to cause, injury or damage to business or property." (*Id.*, subd. (a).)

On February 17, 2016, defendant waived arraignment and pleaded not guilty to all four counts.

On September 12, 2016, the district attorney's office notified attorney Paul Kiesel that a proposed plea agreement had been reached with defendant to settle the criminal complaint. (Mr. Kiesel had been appointed as liaison counsel for the thousands of plaintiffs and 86 law firms involved in 157 coordinated civil suits and class actions filed against SoCalGas over the gas leak.) Mr. Kiesel was informed there would be a pretrial conference the following day. He said he would discuss the matter with co-leads of the plaintiff steering committee, and would send a representative from leadership to the hearing. He was not consulted about the terms of the plea or given advance notice of the terms.

## 2. The Plea Agreement

On September 13, 2016, the proposed settlement agreement was submitted to the trial court and its terms were read into the record.

Under the plea agreement, defendant pleaded no contest to count 1, "for failing to timely report the natural gas leak to the proper authorities, specifically the California Office of Emergency Services . . . and . . . the Los Angeles County Fire Department." The parties acknowledged that any subsequent violation of Health and Safety Code section 25510 "may be charged as a felony." Other terms were:

The court would impose the maximum fine of $75,000 ($25,000 per day of violation) in exchange for the plea to count 1. The court would also impose state penalty assessments "currently estimated to be approximately $232,500"; $246,672.88 for response costs; and "all mandatory fines and fees as required by the court, including any restitution fine to the State Restitution Fund."

6

Defendant agreed to comply with six other terms and conditions, all to be completed prior to sentencing. "In total, SoCalGas will be required to pay and commit approximately $4,004,172 to $4,304,172 to fully complete and satisfy the complete terms of this settlement agreement."[3]

"Provided the terms of this Agreement are complied with by SoCalGas," the district attorney agreed to dismiss the remaining three counts of the complaint at the time of sentencing. And "[g]iven that all of the terms and conditions of this agreement will be required to be completed at or prior to the date of sentencing," the district attorney agreed not to seek or require probation as a condition of the agreement.

After discussion and questions from the court, the court accepted defendant's plea of no contest to count 1, and signed the settlement agreement. The court set the matter for sentencing on November 29, 2016.

3. **Proceedings After the Plea**

On October 18, 2016, attorneys for victims filed a request for withdrawal of the plea agreement. They pointed out victims have a constitutional right to be heard, and a right to restitution under

---

[3] These conditions included installing an infrared methane leak detection system capable of detecting methane crossing from the facility into the community; a binding agreement to hire and maintain six full-time employees to operate and maintain the leak detection systems for at least three years; installation of real-time pressure monitors at each natural gas storage well as required by various orders; testing and certification of the new monitoring systems by an outside third party company; revision and adoption of new reporting policies regarding releases or threatened releases of hazardous materials; and proof that it conducted training courses for employees responsible for leak detection or reporting at all Los Angeles County facilities on specified topics.

7

section 28. They contended the district attorney failed to notify or confer with them before entering the plea agreement, and the plea should be withdrawn. They requested a hearing to consider their claims for restitution "before the court sentences SoCalGas or accepts the plea agreement." They contended a sentence without an award of victim restitution is invalid, and the court has discretion to retain jurisdiction to provide for full restitution to the victims.

On November 7, 2016, the trial court issued a minute order stating the victims "have standing to be heard and express their views concerning the negotiated disposition at the sentencing hearing." The minute order stated that on November 29, 2016, "the court will hear input, comments and objections by victims, and further argument by the parties before proceeding with the sentencing."

On November 22, 2016, defendant opposed the request for withdrawal of the plea agreement. Defendant contended, among other things, that a third party has no right to compel or control the prosecution of an offense, and that restitution was not available on the only count of which defendant was convicted. The district attorney also opposed the request for withdrawal of the plea agreement. The district attorney argued the victims had a right to be heard at sentencing, and a right to lawful restitution, but that count 1 was the only crime from which a victim could receive restitution and there were "no natural direct victims of Count One."

The victims filed a reply, arguing they were entitled to restitution for the failure to report conviction because failure to report an emission cannot occur without an emission, so count 4 was "transactionally related" to count 1.

4. **The Sentencing Hearing**

Four attorneys, plus Mr. Kiesel as liaison counsel for plaintiffs in the civil actions, appeared at the sentencing hearing,

8

representing more than 7,000 victims.[4] The court stated that "the whole point of the hearing today was to allow people who wish to be heard to be heard about their concerns with regard to victim restitution as an issue in the case." The court recognized it had "an independent duty to make an order which satisfies the interests of the victim and protects the victim."

The four attorneys presented arguments to the court on behalf of victims, and six victims also addressed the court.

After the victim statements and argument, the court imposed the agreed sentence and dismissed the remaining counts. The court explained governing principles of prosecutorial discretion and control of the case by the parties to the litigation. While the victims had the right to be heard at the sentencing hearing to express their views on the propriety of the negotiated disposition, they had no right to intervene in the negotiated disposition itself. "So really this boils down to whether the prosecutor has properly exercised their discretion, whether the court should approve the disposition finally."

The court concluded that "in the final analysis . . . the People have not abused their discretion. They actually did something quite constructive to move forward immediately with protective measures, which have been accomplished . . . ."[5] The court issued a detailed written order, including a finding that the prosecutors complied with their duty under Marsy's Law to give notice to the victims prior to the taking of the plea; that it could not impose a

---

[4] Counsel for victims stated that the 7,225 victims were "just the ones that our office and Mr. Panish's office represents. There's twice that out there."

[5] The prosecutor stated for the record that defendant "did comply with all of the terms and have shown us proof of all of that."

*Harvey* waiver[6] (under which a dismissed charge may be considered at sentencing on charges to which the defendant has pleaded guilty) because a defendant's *Harvey* waiver must be voluntary; and there was no basis for restitution under count 1 because the delay in notification "did not cause the damage occasioned by the leak."

The court concluded: "The District Attorney's Office has chosen terms that include proactive, extensive and costly repairs, hiring of additional personnel, testing, monitoring, and inspection and safety protocols, all funded by the defendant moving forward into the future for the general protection of a vast number of citizens in the Northern San Fernando Valley . . . . [T]he Court is persuaded that the District Attorney has acted to protect the greater public interest to achieve a result that protects not only the potential direct victims in this case, but the larger general citizenry, and does so by agreement thereby avoiding costly and protracted efforts at achieving the same remedies through the courts with civil, eminent domain, condemnation, or injunctive relief litigation. . . . Count 4's dismissal is warranted without a *Harvey* waiver in such circumstances, in the exercise of the People's discretion, and the Court is well within its reasoned discretion to approve this settlement in light of the immense overall public benefit to be derived thereby."

**5.     Postsentencing Proceedings**

On December 28, 2016, the victims filed a notice of appeal to the appellate division from the judgment of conviction and from the denial of their request for restitution. The next day, the victims filed a petition for writ of mandate, asking the appellate division to set aside the trial court's order denying direct victim restitution. A few days later, the appellate division denied the writ petition "on

---

[6]     *People v. Harvey* (1979) 25 Cal.3d 754 (*Harvey*).

10

the ground the victims have an adequate remedy at law via their direct appeal from the order denying restitution."

On August 7, 2018, the appellate division issued an opinion concluding the victims lacked standing to appeal the order, but had a right to seek a writ of mandate. Treating the appeal as a writ petition, the court denied it. The court held (1) there was no right to restitution under count 4, because defendant was not convicted of that crime; (2) there was no right to restitution under count 1 based on its "transactional relationship" to count 4; and (3) as for count 1, the victims did not establish "that any economic losses they sustained resulted from the criminal conduct for which defendant was convicted."

On September 21, 2018, the victims petitioned this court for a writ of mandate directing the appellate division to vacate its opinion and to remand the matter to the trial court "for a proper hearing on restitution." We issued an order to show cause why petitioners are not entitled to the relief requested in the petition.

We now deny the petition in part and remand to permit petitioners to prove damages stemming only from the three-day delay in reporting the leak.

## DISCUSSION

### 1.    The Direct Appeal Issue

As stated at the outset, we conclude the California Constitution does not authorize a direct appeal by a victim from a judgment or order in a criminal case. Section 28 authorizes a victim to enforce his or her right to restitution in trial and appellate courts, but does not specify enforcement by way of direct appeal. The right to appeal is ordinarily conferred by statute, and to date has been conferred only upon the parties to an action.

While the voters could authorize a right of direct appeal by constitutional amendment, they did not do so here. We cannot

infer, based on the language of section 28, that the voters intended a fundamental change in longstanding criminal and appellate procedure without expressly so stating. This is particularly so in light of Supreme Court precedent, well-established at the time Marsy's Law was approved by the voters, that "recognition of citizen standing to intervene in criminal prosecutions" would "undermine the People's status as exclusive party plaintiff in criminal actions, interfere with the prosecutor's broad discretion in criminal matters, and disrupt the orderly administration of justice." (*Dix, supra,* 53 Cal.3d at pp. 453-454.)

We describe the governing constitutional and statutory provisions and case precedents that inform our decision, and then turn to the petitioners' contentions.

> **a.      Section 28, implementing statutes,**
> **and principles of construction**

The Supreme Court described the background of direct victim restitution under the California Constitution in *People v. Martinez* (2017) 2 Cal.5th 1093, 1100 (*Martinez*). The court explained that in 1982, by Proposition 8, "commonly known as The Victims' Bill of Rights," the electorate declared "an 'unequivocal intention . . . that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer,' and instruct[ed] the Legislature to adopt legislation to implement this directive." (*Ibid.*)

"The Legislature's response, currently codified in [Penal Code] section 1202.4, similarly declares that it is the Legislature's intent 'that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime.' " (*Martinez, supra,* 2 Cal.5th at p. 1100, quoting § 1202.4, subd. (a)(1).) "To that end, section 1202.4 provides that, with certain exceptions not relevant here, 'in

12

every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims.' " (*Ibid.*, quoting § 1202.4, subd. (f).) "The statute further provides that the court's restitution order shall, '[t]o the extent possible . . . fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct.' " (*Id.* at p. 1101*,* quoting § 1202.4, subd. (f)(3).) "This provision, as the Courts of Appeal have uniformly held, . . . authorizes trial courts to order direct victim restitution for those losses incurred as a result of the crime of which the defendant was convicted." (*Ibid.*)

In addition to the right to restitution, section 28 as originally approved in 1982 gave victims the right to attend, to adequate notice of, and to express views on restitution at "all sentencing proceedings." (Pen. Code, § 1191.1.) As amended by Marsy's Law in 2008, section 28 refers to the right "to seek and secure restitution" (§ 28, subd. (b)(13)(A)), and enumerates 16 other rights as well. Victims are entitled to these 17 rights "[i]n order to preserve and protect a victim's rights to justice and due process." (§ 28, subd. (b).) The rights include, as relevant here, the right to "reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding . . . the charges filed," and "to be notified of and informed before any pretrial disposition of the case" (*id.*, subd. (b)(6)); to reasonable notice of and to be present at "all public proceedings . . . at which the defendant and the prosecutor are entitled to be present" (*id.*, subd. (b)(7)); and "[t]o be heard . . . at any proceeding . . . involving a . . . plea, sentencing, . . . or any proceeding in which a right of the victim is at issue" (*id.*, subd. (b)(8)).

The Marsy's Law amendment to section 28 also changed the Constitution in two other ways relevant here. It specified that

13

restitution must be ordered in every case (deleting the 1982 language that required restitution "unless compelling and extraordinary reasons exist to the contrary" (*id.*, former subd. (b)). And it added the provision allowing a victim to enforce the 17 rights enumerated in section 28: "A victim, the retained attorney of a victim, a lawful representative of the victim, or the prosecuting attorney upon request of the victim, may enforce the rights enumerated in subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right. The court shall act promptly on such a request." (*Id.,* subd. (c)(1); see *id.*, subd. (f) [referring to the subdivision (b) enumerated rights "that are personally enforceable by victims as provided in subdivision (c)"], and subd. (a)(3) [referring to victims' rights as including "personally held and enforceable rights described in paragraphs (1) through (17) of subdivision (b)"].)

When we construe an initiative such as Marsy's Law, "we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571.) "[W]hen construing initiatives, we generally presume electors are aware of existing law." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934.)

14

### b. *Dix v. Superior Court*

We are also and necessarily guided by the Supreme Court's discussion in *Dix* of the "general rule that neither a crime victim nor any other citizen has a legally enforceable interest, public or private, in the commencement, conduct, or outcome of criminal proceedings against another." (*Dix, supra,* 53 Cal.3d at p. 450.)

*Dix* involved the trial court's recall of the defendant's sentence under Penal Code provisions that allowed the court to resentence "for any reason that could influence the exercise of sentencing discretion generally, including events which have occurred since the original sentence was imposed." (*Dix, supra,* 53 Cal.3d at p. 448 [describing Pen. Code, § 1170, subd. (d)].) The victim of the defendant's crime sought a writ of mandate to overturn the recall order and prevent substitution of a new sentence. (*Dix,* at p. 447.) The Court of Appeal issued the writ, but the Supreme Court found the Court of Appeal erred when it held the victim had standing to litigate the sentencing issue. (*Id.* at pp. 447-448.) The Supreme Court concluded that "[n]either a crime victim nor any other member of the public has general standing to intervene in an ongoing criminal proceeding against another person." (*Id.* at p. 448.) *Dix* stands for several pertinent points.

The court found the victim could not "intervene by writ in [the defendant's] sentencing. Except as specifically provided by law, a private citizen has no personal legal interest in the outcome of an individual criminal prosecution against another person. Nor may the doctrine of 'public interest' standing prevail over the public prosecutor's exclusive discretion in the conduct of criminal cases." (*Dix, supra,* 53 Cal.3d at p. 451.)

The court explained that "[t]he parties to a criminal action are the People, in whose sovereign name it is prosecuted, and the person accused [citations]; the victim of the crime is not a party

15

[citation]." (*Dix, supra,* 53 Cal.3d at p. 451.) "The prosecutor ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek." (*Ibid.*) A private person cannot institute criminal proceedings independently, "and the prosecutor's own discretion is not subject to judicial control at the behest of persons other than the accused." (*Ibid.*) "An individual exercise of prosecutorial discretion is presumed to be ' "legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement." ' " (*Ibid.*)

Further, "[e]xclusive prosecutorial discretion must also extend to the *conduct* of a criminal action once commenced." (*Dix, supra,* 53 Cal.3d at p. 452.) It is the prosecutor's responsibility "to decide in the public interest whether to seek, oppose, accept, or challenge judicial actions and rulings," and "[t]hese decisions, too, go beyond safety and redress for an individual victim; they involve 'the complex considerations necessary for the effective and efficient administration of law enforcement.' " (*Ibid.*) "There is no place in this scheme for intervention by a victim pursuing personal concerns about the case." (*Ibid.*)

### c.    Contentions and conclusions

It is against the backdrop just described that we assess petitioners' contention that they have "an independent right to appeal" a trial court's denial of their request for restitution.

As we have stated, the right of victims to "enforce the rights enumerated . . . in any trial or appellate court with jurisdiction over the case" (§ 28, subd. (c)(1)) – and the court's corresponding duty to "act promptly on such a request" (*ibid.*) – do not suggest to us an "independent right to appeal" a restitution order. The recognition of such a right in the absence of language expressly conferring it is inconsistent both with the prosecutor's exclusive discretion to

conduct a criminal case, including whether to challenge judicial actions, and with the fundamental principle that the only parties to a criminal action are the prosecutor and the defendant. (*Dix, supra,* 53 Cal.3d at pp. 451-452.)

Petitioners resist this conclusion with several arguments.

### i. The constitutional language

Petitioners tell us they have a constitutional right to enforce their restitution rights in "any trial or appellate court with jurisdiction over the case . . . ." (§ 28, subd. (c)(1).) Indeed they do. But petitioners simply assume this means they have an independent right to a direct appeal. They do not. Neither the language of section 28 nor the ballot materials accompanying Marsy's Law give any indication the voters intended to change current statutory provisions on the right to appeal in a criminal case. Several points are pertinent.

First, an appellate court has "jurisdiction over the case" when one of the parties – the prosecutor or the defendant – takes an appeal. For misdemeanor cases, Penal Code section 1466 delineates all the cases in which an appeal may be taken "[b]y the people" (*id.,* subd. (a)) and "[b]y the defendant" (*id.,* subd. (b)). Nothing in Marsy's Law makes the victim a party to the case, or purports to change Penal Code section 1466. Without party status, there is no basis for a direct appeal. Of course, once the appellate court has jurisdiction over the case, Marsy's Law gives victims the right to participate in those proceedings to enforce the rights conferred on victims in section 28.

Second, nothing in the ballot materials accompanying Marsy's Law suggested any change in the right to appeal from a criminal judgment. The ballot materials described the changes that would

17

be made by the amendment.[7]  The legislative analyst described the changes the initiative would make in "notification and participation of victims in criminal justice proceedings" this way:  "As noted above, Proposition 8 [the 1982 initiative] established a legal right for crime victims to be notified of, to attend, and to state their views at, sentencing and parole hearings.  This measure expands these legal rights to include all public criminal proceedings, including the release from custody of offenders after their arrest, but before trial.  In addition, victims would be given the constitutional right to participate in other aspects of the criminal justice process, such as conferring with prosecutors on the charges filed.  Also, law enforcement and criminal prosecution agencies would be required to provide victims with specified information, including details on victim's rights."  (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) analysis of Prop. 9 by Legislative Analyst, pp. 58-59.)  In short, there is no intimation that the changes included a right of direct appeal for victims from a restitution order or any other order in a criminal case.

Third, and perhaps most importantly, the Constitution's appellate jurisdiction clause establishes and allocates judicial authority; it does not define or guarantee a litigant's right to appeal.  (See *Leone v. Medical Board* (2000) 22 Cal.4th 660, 665-666 (*Leone*) ["the appellate jurisdiction vested in the Courts of Appeal by article VI, section 11, of the California Constitution encompasses review by extraordinary writ as well as review by direct appeal"].)

---

[7]     In addition to amending the Constitution and various state laws to "expand the legal rights of crime victims and the payment of restitution by criminal offenders," Marsy's Law "restrict[ed] the early release of inmates" and "change[d] the procedures for granting and revoking parole."  (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) analysis of Prop. 9 by Legislative Analyst, p. 58.)

18

*Leone* construes the clause of the Constitution that gives Courts of Appeal " 'appellate jurisdiction when superior courts have original jurisdiction,' " and tells us that "[n]othing in this language conveys an intention to grant litigants a right of direct appeal from judgments in proceedings within the superior courts' original jurisdiction." (*Leone,* at p. 666; see *ibid.* ["In particular, the reference to 'appellate jurisdiction' does not imply a right of litigants to bring direct appeals."]; see *id.* at p. 667 ["Nor does the ballot pamphlet for the November 1966 election mention a right of appeal under the state Constitution."].)

We see no reason for a different construction of the constitutional right under section 28 to "enforce" the victim's rights "in any trial or appellate court with jurisdiction over the case as a matter of right." (*Id.,* subd. (c)(1).) That is to say, the right to enforcement in an appellate court is not necessarily the equivalent of a right to direct appeal. "[A] reviewing court may exercise appellate jurisdiction – that is, the power to review and correct error in trial court orders and judgments – either by a direct appeal or by an extraordinary writ proceeding." (*Leone, supra,* 22 Cal.4th at p. 668.) An extraordinary writ proceeding is particularly appropriate in circumstances where the person with the enforcement right is not a party to the proceeding.

Thus, in the unusual case where the trial court improperly refuses or otherwise errs in awarding restitution, and no appeal is taken, the victim may enforce the right to restitution in the appellate courts by seeking a writ of mandate.

We recognize that the *Dix* case involved a writ of mandate, and that *Dix* rejected "the holding below that [the victim] may intervene by writ in [the defendant's] sentencing." (*Dix, supra,* 53 Cal.3d at p. 451.) But the court prefaced its ruling with the caveat, "[e]xcept as specifically provided by law." (*Ibid.*) *Dix* preceded the

19

passage of Marsy's Law, which allows crime victims to enforce their enumerated rights in appellate courts. It seems clear to us that the right specified in Marsy's Law, unlike the circumstances in *Dix*, satisfies the principle that "[o]rdinarily, the writs will be issued only to persons who are 'beneficially interested.' "[8] (*Dix,* at p. 450.) A victim is necessarily "beneficially interested" in an award – or a refusal to award – restitution.

In short, our conclusion – that the enforcement right in section 28 is not a right of direct appeal, but a right to obtain appellate review by seeking a writ of mandate – is consonant both with the language and intent of Marsy's Law, and with principles of prosecutorial discretion and appellate review that were well established when the voters approved Marsy's Law.[9]

---

[8] *Dix* did not involve restitution. *Dix* recognized that the Constitution and statutes at that time accorded individual felony victims certain rights, including the right to restitution in appropriate circumstances, and concluded that "[w]hatever special considerations of standing may apply to this limited category of 'victims' rights,' " challenges based on the recall statute did not implicate those rights. (*Dix, supra,* 53 Cal.3d at p. 453.)

[9] Petitioners' next argument is that the Legislature may not, by failing to amend the Penal Code with express statutory language stating victims have the right to appeal, abridge their constitutionally granted right to appeal. They cite *Byers v. Smith* (1935) 4 Cal.2d 209, 214 (Legislature has no power "either through direct enactment or indirect device, to destroy or abridge the right of an appeal constitutionally granted"). As we have just discussed, section 28 does not grant a "right to appeal." Moreover, in *Leone* the court found reliance on *Byers* for a constitutional right to appeal was "misplaced," among other reasons because *Byers* did not construe the clause at issue and did not distinguish between review by writ petition and review by direct appeal. (*Leone, supra,* 22 Cal.4th at pp. 667-668.)

### ii. The case authorities

Petitioners contend that appellate decisions have acknowledged a crime victim's right to appeal, citing *Melissa J. v. Superior Court* (1987) 190 Cal.App.3d 476 (*Melissa J.*) and *People v. Hannon* (2016) 5 Cal.App.5th 94 (*Hannon*). Petitioners misconstrue these cases.

#### *Melissa J.*

Petitioners contend that, even before Marsy's Law gave enforcement rights to victims, *Melissa J.* recognized that crime victims had the right to appeal. That is not so.

In *Melissa J.*, the court granted the victim's petition for writ of mandate, and set aside the trial court's order terminating a restitution provision in the defendant's probation order. The court held that, as to restitution, "the notice and right to appear requirements [in the Victims' Bill of Rights] are mandatory," and if those requirements are not satisfied, "the victim may challenge a ruling regarding restitution." (*Melissa J., supra,* 190 Cal.App.3d at p. 478.) The court held the trial court erred "in terminating restitution without first satisfying itself that petitioner had been properly notified of the hearing." (*Ibid.*)

*Melissa J.* did not recognize a victim's right to appeal. Indeed, the court observed that the petitioner "could have received the same relief by moving the trial court to vacate its ruling terminating restitution." (*Melissa J., supra,* 190 Cal.App.3d at p. 479.) The court explained that the victim is *not* considered a party to a criminal proceeding, but "where the court has issued an order concerning restitution, the victim may assert his or her legitimate rights by the procedures available to parties. Thus, in future cases, victims not notified of proceedings will be required to exhaust their remedies in the trial courts before seeking relief in appellate courts." (*Ibid.*)

21

Petitioners assert – with no rational basis – that by the language just quoted, *Melissa J.* establishes that, like parties, "*future* victims would have standing to appeal." The contention is patently wrong. *Melissa J.* supports the proposition that, in future cases, a writ would be denied if the victims did not exhaust remedies in the trial court. It neither says nor implies anything about a right to appeal.

### Subramanyan

Before we turn to *Hannon*, we pause to describe the case to which *Hannon* refers: *People v. Subramanyan* (2016) 246 Cal.App.4th Supp. 1 (*Subramanyan*). Petitioners describe that case as an "Appellate Division outlier[]."

*Subramanyan* was an appeal by a victim from a trial court's order denying him additional restitution for attorney fees he incurred in a civil action against the defendant. (*Subramanyan, supra,* 246 Cal.App.4th at p. Supp. 4.) The court saw "no provision in Marsy's Law that specifically permits a victim to appeal a restitution order," while the Penal Code "specifically directs that appeals are limited to the People or the defendant," citing section 1466. (*Subramanyan,* at p. Supp. 7.) The court found that "[n]othing in the legislative intent or [Marsy's Law] itself allows the victim to substitute in and replace the role of the prosecutor." (*Ibid.*) *Subramanyan* concluded that, "once the judgment was entered at the trial court, only the prosecutor, acting on behalf of the People, or the defendant could initiate the appeal. If such an appeal were initiated, the victim could then participate pursuant to Marsy's Law." (*Id.* at p. Supp. 8.) Thus, the court dismissed the appeal for lack of standing. (*Ibid.*)

### Hannon

That brings us to *Hannon*, on which petitioners place their principal reliance. In *Hannon*, the defendant appealed from the

22

trial court's restitution award, and the court granted the victim's request to file an impact statement on appeal. The court held that Marsy's Law "entitles a victim to file an impact statement on appeal but does not obligate this court to consider new issues and facts in such a statement." (*Hannon, supra,* 5 Cal.App.5th at p. 101, capitalization omitted.) The court observed its interpretation of section 28 "means the victim's claims of error will remain unresolved. That is because, absent those circumstances where writ proceedings are appropriate, the mechanism by which claims of error are properly brought to this court's attention is through the filing of an appeal," and the victim did not attempt to appeal the trial court's restitution order. (*Hannon,* at p. 107.) Then the court stated, "We recognize there is some uncertainty whether the victim would have had standing to appeal the restitution award, but we do not have occasion in the present case to decide that issue." (*Ibid.*)

Thus, far from "recogniz[ing] that crime victims must have a right to appeal," *Hannon* did not decide the issue, saying it was "for future courts to address." (*Hannon, supra,* 5 Cal.App.5th at p. 107, fn. 7.) Petitioners point to *Hannon*'s comments, by way of footnote, that if there is no right to appeal, "then the victim's claims of error may go unheard," and "[a]rguably, a victim has a right to appeal under" section 28's enforcement provision. (*Hannon,* at p. 107, fn. 7.) *Hannon* then described the *Subramanyan* opinion, and suggested that it "did not explain how its result was consistent with the language of Section 28, subdivision (c)(1) and did not explain how, consistent with due process, a victim could enforce the right to restitution without the ability to appeal an erroneous restitution award. Those issues, including any conflict between the rights given victims under Marsy's Law and the People's prosecutorial authority, are for future courts to address." (*Hannon,* at p. 107, fn. 7.)

We are not persuaded by *Hannon*'s comments on an issue it did not consider, analyze or decide. We have explained our analysis in detail, and we summarize it again: Nowhere does section 28 state or imply that a victim may enforce his or her right to restitution by appealing from a criminal judgment or order. Nor is there any evidence the voters intended that the enforcement provision of section 28 would expand the limitations in the Penal Code on the right to appeal. In light of settled principles that the only parties to a criminal case are the People and the accused; that the prosecutor has exclusive discretion in the conduct of criminal cases (*Dix, supra,* 53 Cal.3d at p. 451); and that a right to appellate review does not necessarily imply a right of direct appeal, we can only conclude that victims do not have that right under Marsy's Law.

Accordingly, we turn to the merits of the victims' writ petition.

## 2. The Claim that the Criminal Conduct for which Defendant Was Convicted "Encompassed" the Criminal Discharge of Hazardous Substances

Petitioners argue that, because defendant was convicted of failure to immediately report the release of a hazardous material, a "criminal release of hazardous materials" must have occurred. Ergo, defendant's "criminal discharge of hazardous materials is criminal conduct encompassed in its criminal failure to timely report that discharge," entitling them to restitution for losses caused by the criminal discharge of hazardous materials.

This facile contention cannot survive serious scrutiny. It omits the fundamental requirement of an actual verdict after trial or an admission by the defendant to a specific criminal charge. We are unaware of any principle under which we may conclude a defendant has been "convicted of the crime[]" (§ 28, subd. (b)(13)(A))

24

in the absence of a verdict on or plea to that crime. And nothing in the case petitioners cite (*People v. Walker* (2014) 231 Cal.App.4th 1270 (*Walker*)) persuades us otherwise. *Walker* does not stand for the proposition that restitution may be ordered for "criminal conduct" to which the defendant has not pleaded or been found guilty.

In *Walker*, the defendant pleaded no contest to four counts of "DUI causing injury" based on a single incident in which he hit eight different vehicles carrying nine passengers. (*Walker, supra*, 231 Cal.App.4th at p. 1273.) The defendant contended that the court imposed restitution for crimes of which he was not convicted, because two of the victims to whom restitution was awarded were not named in the charging document. (*Id.* at p. 1274.) The court concluded that, "[b]ecause there was only one instance of driving under the influence," and the defendant pleaded no contest to that instance, the losses suffered by anyone involved in that instance arose out of " 'the criminal conduct for which the defendant has been convicted.' " (*Id.* at pp. 1275-1276.) "Whether these potential victims were specifically named in the charging document is irrelevant." (*Id.* at p. 1276.)

In assessing defendant's claim, *Walker* stated, at the beginning of its analysis, that "understand[ing] the conduct of which [the defendant] stands convicted . . . turns on what conduct is encompassed by the crime of DUI causing injury." (*Walker, supra*, 231 Cal.App.4th at p. 1275.) Petitioners seize on those words as, in effect, establishing a rule of law that any conduct "encompassed" in the elements of the crime of which a defendant is convicted is itself "criminal conduct" of which the defendant has been convicted. *Walker* suggests nothing of the sort.

In *Walker*, the defendant pleaded no contest *to committing the criminal act* – driving under the influence causing injury – *that*

25

*caused the economic loss* to the victims. While two of the victims were not named in the charges, the defendant conceded they were among the nine passengers in the eight different vehicles the defendant hit in the accident he caused. (*Walker, supra,* 231 Cal.App.4th at p. 1273.) Those circumstances fit well within the principle courts are required to apply: that "the court may order restitution only for losses arising out of the 'criminal conduct *for which the defendant has been convicted.*'" (*Id.* at p. 1274, italics added; see *ibid.* ["This result is dictated by the language of [Penal Code] section 1202.4 . . . and *by the unfairness that would result if a defendant were held responsible for losses caused by conduct underlying charges that were dismissed* or of which he was acquitted," italics added].)

A conviction of a failure-to-report violation is not a conviction for the underlying conduct that was not reported. Any other conclusion is rationally unsustainable.

3.    **The "Transactionally-related" Argument**

Next, petitioners tell us that, because the dismissed count 4 is "transactionally related" to the crime to which defendant pleaded no contest, restitution must be ordered for economic losses caused by the dismissed count. We disagree. The legal authorities petitioners cite do not support their claim.

In *Harvey, supra,* 25 Cal.3d 754, the Supreme Court concluded it would be "improper and unfair" to permit a sentencing court to consider any facts underlying a dismissed count "for purposes of aggravating or enhancing defendant's sentence." (*Id.* at p. 758.) Implicit in the plea bargain, *Harvey* stated, was "the understanding (in the absence of any contrary agreement) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count." (*Ibid.*)

26

The *Harvey* rule, however, does not preclude the sentencing court " 'from reviewing all the circumstances relating to [the defendant's] *admitted* offenses to the legislatively mandated end that a term, lower, middle or upper, be imposed on [the defendant] commensurate with the gravity of his crime.' " (*Harvey, supra,* 25 Cal.3d at p. 758.) The court denominated such facts as "*transactionally related* to the offense to which defendant pleaded guilty." (*Ibid.*)

The *Harvey* rule (or its exception) has been applied in cases involving increased prison terms, and to conditions of probation. (E.g., *People v. Klaess* (1982) 129 Cal.App.3d 820, 823 ["facts used . . . to aggravate defendant's sentence were inseparably and integrally a part of defendant's admitted offense and were therefore properly considered"; "[t]he *Harvey* court recognized that the rule must give way . . . when it would prevent the trial court from considering all the factors necessary to an informed disposition for the offenses to which defendant has pleaded guilty"]; *People v. Beagle* (2004) 125 Cal.App.4th 415, 421, 417-418 ["[w]e see no basis for distinguishing conditions of probation from prison sentences in this context"; "[a] condition of probation adding a restriction on the defendant's conduct is an 'adverse sentencing consequence' "; trial court could not impose a drug-related probation condition on a defendant who pleaded guilty to a weapon charge, based on facts relating to the dismissed drug charge].)

Petitioners invoke the cases just cited to argue that the same principle applies to restitution. We think not. The cases petitioners cite involve a sentencing court's authority to consider facts underlying a dismissed count in deciding the length of a defendant's sentence, or the conditions of a defendant's probation, on the admitted charge. A court may consider those facts only if "some action of the defendant giving rise to the dismissed count was also

involved in the admitted count." (*Beagle, supra,* 125 Cal.App.4th at p. 421.) But those principles have nothing to do with a court's constitutionally mandated *duty* – not its discretionary authority – to order the defendant to pay full restitution to victims who incur an economic loss "as a result of the commission of a crime," from "a defendant convicted of that crime." (Pen. Code, § 1202.4, subd. (a)(1).)

We are disinclined to apply legal rules for determining the length of a defendant's sentence or the conditions of his or her probation to the entirely different question of the constitutionally-prescribed circumstances for a restitution order. While restitution may be an "adverse sentencing consequence" from the defendant's point of view, not all such consequences have the same ramifications. For one thing, "direct victim restitution is not a criminal penalty. [Citation.] '[D]irect victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased "punishment." ' " (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1398 (*Foalima*); see also *People v. Gross* (2015) 238 Cal.App.4th 1313, 1315 ["[t]he obligation to make a victim whole through direct victim restitution is a constitutional mandate that serves to protect public safety and welfare, rather than to punish the defendant"].)

More importantly, restitution is governed by provisions of the Constitution and implementing statutes that are explicit in their scope and application. Restitution is not akin or even analogous to the length of a prison term (e.g., upper, middle or lower) or to the conditions of a defendant's probation, both of which involve an exercise of the sentencing court's sound discretion, as guided by statute and court rules. (E.g., Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.420; see also rule 4.421 ["Circumstances

28

in aggravation include factors relating to the crime and factors relating to the defendant."].)

Restitution, by contrast, "shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (§ 28, subd. (b)(13)(B); Pen. Code, § 1202.4, subd. (f) ["The court shall order full restitution."].) No discretion is involved, and the award does not depend on anything other than the crime of which defendant was convicted and the economic loss caused by that crime – no matter how "transactionally related" it may be to some other charge of which a defendant has not been convicted. In short, the appellate division did not "br[eak] with precedent," as petitioners claim, when it concluded that "transactional relationship is not the test" for determining entitlement to direct victim restitution – quite the contrary.[10]

---

[10] The point is further demonstrated by the differences between a court's power to order direct victim restitution and a court's power to order restitution as a condition of probation. "[T]he restitution power conferred by [Penal Code] section 1202.4 stands in contrast to a court's power to order restitution as a condition of probation." (*Martinez, supra,* 2 Cal.5th at p. 1101.) In the latter case, the court's discretion "has long been held to include the power to order restitution 'even when the loss was not necessarily caused by the criminal conduct underlying the conviction,' including in cases in which 'the loss was caused . . . by conduct underlying dismissed and uncharged counts . . . .' " (*Ibid.*) "A trial court's power to order restitution in probation cases is thus broader than its power to order direct victim restitution under section 1202.4 in cases in which the defendant receives a nonprobationary sentence." (*Ibid.*) " 'When section 1202.4 imposes its mandatory requirements in favor of a victim's right to restitution, the statute is explicit and narrow.' " (*Id.* at pp. 1101-1102.)

This is not to say, of course, that a defendant may not agree, by way of a *Harvey* waiver, to the payment of direct restitution on a dismissed count as a condition of the plea, if the plea is "freely and voluntarily made" – Penal Code section 1192.3 specifically provides for that circumstance.  But those are not the facts here.

In sum, the rules on restitution are set in constitutional and statutory law, and we see no basis for construing them to say more than they do.  Direct victim restitution is available only for losses resulting from the commission of a crime, from a defendant convicted of that crime.  (Cf. *People v. Jessee* (2013) 222 Cal.App.4th 501, 510 ["Based upon the plain language of these statutes, we conclude restitution may only be awarded for crimes the defendant is charged with and convicted of, even if the evidence shows beyond a reasonable doubt and the trial court finds the defendant committed an uncharged crime."].)

4.     **The Claim for Economic Losses Resulting From Defendant's Failure to Report the Gas Leak**

Petitioners' final contention is that they are entitled to restitution for economic losses they incurred as a result of defendant's failure to report the gas leak for three days. As stated earlier, the trial court rejected this claim, observing that the failure to report was not "a crime that includes obvious causation," and that "[t]he delay in the defendant's required notifications to various authorities upon discovery of the gas leak did not cause the damage occasioned by the leak; the damage would have occurred with or without the timely notification."

The appellate division observed petitioners had the burden to demonstrate defendant's failure to report the gas leak was a substantial factor in causing their injuries, and agreed with the trial court that they "failed to establish a causal connection between defendant's failure to timely report the leak and any claimed

30

injuries or losses they sustained as a result of that criminal conduct." The court elaborated:

"The Victims offered no evidence in their written motion, nor at the hearing on the motion, and they made no satisfactory offer of proof to support the claim, made for the first time at the hearing, that they were damaged by defendant's three-day delay in reporting the leak. They did assert at the hearing that, had defendant reported the leak 'immediately,' the health department would have 'red tagged' the homes and then 'all of this damage' could have been prevented. Notably, however, the Victims did not elaborate on *what* damages were specifically attributable to defendant's delay in reporting the leak, as opposed to the leak itself. Indeed, the individual victims who spoke at the hearing exclusively addressed their right to restitution for the losses and injuries they suffered as a result of the leak and their sustained exposure to the leaked hazardous materials, not the delay in reporting the leak. No offer of proof was made that certain victims would testify that, had the leak been immediately reported, they could have responded immediately by evacuating their homes, and they would not have sustained injuries during the three days defendant did not report the leak."

Petitioners tell us the court applied an "erroneous strict causation standard" that is "unprecedented," "overly stringent" and "unsupported by the law." That is simply not the case. The court applied the "substantial factor" standard just as it was required to do.

It is not enough to point out we are to give a "broad and liberal construction" to the statute implementing the constitutional right to restitution. (*Martinez, supra,* 2 Cal.5th at p. 1107.) As *Martinez* states, "[e]ven giving broad and liberal construction to [Penal Code] section 1202.4 [citation], we must give effect to the unambiguous language the Legislature has chosen." (*Ibid.*

31

[referring to the limitation of restitution to losses incurred " 'as a result of the commission of a crime' "].)  As was the case before the trial court and the appellate division, petitioners point to no evidence, and refer to no offer of proof that would support a finding, that the three-day failure to report was a substantial factor in causing their injuries.

Petitioners offer only counsel's speculation that the losses they suffered "could have been lessened or obviated altogether" by reporting the leak three days earlier.  Nothing in the record suggests that is so.  And the case petitioners cite for the (correct) proposition that the substantial factor test should not be applied too narrowly (*Foalima, supra,* 239 Cal.App.4th at p. 1397) demonstrates the lack of merit in their claim.  "The test, put simply, is whether [the victim] would have incurred damages had there been no [crime for which the defendant was convicted]."  (*Ibid.*)  In *Foalima*, the answer was "clearly no."  (*Ibid.*)  Here, the answer is clearly yes.  As the trial court stated, "the damage would have occurred with or without the timely notification."  No evidence or victims' comments or other offer of evidence that could be produced suggested otherwise.

We agree with the trial court and appellate division that the evidence presented at the sentencing hearing was woefully insufficient to prove damages from the reporting delay itself – the proper measure of restitution.  Nonetheless, we believe there was enough confusion about the scope of the sentencing hearing to warrant a new hearing on the issue of restitution only for damages occasioned by the three-day delay in reporting the leak.  The trial court stated at the start of the hearing that "the whole point of the hearing today was to allow people who wish to be heard to be heard about their concerns with regard to victim restitution as an issue in the case."  Counsel later stated that "[w]e weren't quite sure how

32

the court wanted to proceed in regards to the victims," and the court responded that "the court wasn't sure how you all wanted to proceed, so I made arrangements to dedicate as much time as necessary to resolve this." These remarks establish that neither the court nor counsel clarified in advance the proper legal parameters of the hearing, that is, whether proof would be considered for all losses stemming from the leak itself, or whether proof would be limited to damages stemming only from the three-day delay in reporting the leak.

The district attorney, as the local prosecutor of this environmental crime, was responsible in the first instance to propose to the court and the parties a process by which the victims might seek to enforce their rights to restitution. As the victims' counsel pointed out at oral argument, this was not the first environmental crime to be prosecuted by the district attorney, nor is it likely to be the last. Because the scope of the restitution hearing was not settled in advance, we believe it fair (and within the spirit of Marsy's Law) to remand for a further hearing to determine what, if any, damages were caused only by the three-day delay in reporting the leak to the proper authorities, to which SoCalGas pleaded no contest as charged in count 1.

There is one final point, however, regarding of the agreed-upon plea bargain notice to the victims. In their reply to the returns of defendant and the district attorney, petitioners offer, as a basis for concluding the courts below applied an "overly-strict" causation standard, the claim that the district attorney violated Marsy's Law by (among other things) failing "to give notice to each of the Victims, or at the very least their attorneys, prior to" the trial court's acceptance of the negotiated plea at the September 13, 2016 hearing. They say this deprived them of "a meaningful opportunity

to be heard or to submit evidence of their economic losses." We reject this contention for two reasons.

Petitioners did not assert any notice violations of Marsy's Law in their petition as a basis for seeking writ review. (See *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant."].)[11]

The district attorney notified Mr. Kiesel, liaison counsel in the civil cases, the day before the hearing on the negotiated plea. We agree with the trial court that this was satisfactory notice of the proposed plea agreement. Petitioners have not explained how they were prejudiced by the manner or timing of the notice to Mr. Kiesel of the plea hearing.

## CONCLUSION

We conclude with the observation we made at the beginning: No injustice flows from the legal principles we have applied. While many petitioners have suffered greatly from the Aliso Canyon gas leak, there is recompense to be had in the civil courts, and indeed a specially assigned civil court to hear such cases.[12]

---

[11]     Amicus curiae raise the same issue: alleged violation of victims' constitutional rights "to be notified of a pending plea agreement and to be present and heard at that hearing." We decline to consider it. "The general rule, which we apply here, is that amicus curiae may not raise new issues but 'must accept the case as it finds it.'" (*Bruno v. Superior Court* (1990) 219 Cal.App.3d 1359, 1365.)

[12]     The prosecutor pointed out at the sentencing hearing that some restitution had already been paid. "[A]t the time of the plea over $500 million was expended on relocation costs, cleaning of the homes, boarding animals, relocating schools, mileage if a victim's commute to work was longer in the relocated home than it would

We know, of course, that criminal restitution is an entirely independent constitutional right, but it is available only for losses resulting from crimes of which the defendant has been convicted. Victims may seek writ review, as petitioners did here, when they believe a trial court has failed to follow that constitutionally mandated principle. Defendant pleaded no contest only to the failure to report violation, and this court cannot interfere, in the absence of any illegality, with the prosecutor's discretion to accept that plea. There was no illegality. The trial court found the plea agreement "protect[ed] not only the potential direct victims in this case, but the larger general citizenry." We find no basis to say otherwise.

## DISPOSITION

The issue of restitution for damages caused only by the three-day delay in reporting the leak is remanded to the trial court for a new hearing. Otherwise the petition for writ of mandate is denied. Parties to bear their own costs.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.          RUBIN, J.*

---

have been in their original home, and meals if the housing that they were provided didn't include a kitchen. And these are the types of expenses that would have been actual economic losses available as restitution in count four. They were being paid out . . . before the People, meaning the district attorney's office, filed any charges."

* Presiding Justice of Division Five of the Second District Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.