Filed 5/2/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P.,<br><br>    Defendant and Respondent. | 2d Crim Nos. B315256,<br>B316508)<br>(Super. Ct. No. 1495091)<br>(Santa Barbara County) |
| VICTIM RESTITUTION CLAIMANTS,<br><br>    Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SANTA BARBARA COUNTY,<br><br>    Respondent;<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., et al.,<br><br>    Real Parties in Interest. | 2d Crim. No. B317229<br>(Super. Ct. No. 1495091)<br>(Santa Barbara County) |

Environmental crimes have far-reaching impacts on the community and can result in complex restitution determinations. Here we hold restitution cannot be denied based on mediated civil settlements or a class action lawsuit, and that persons seeking restitution have the right to make oral impact statements to the court. Nevertheless, we conclude the trial court properly denied restitution to fishers for catches reduced by an oil spill where the loss to each was not established. We also conclude oil platform workers and businesses whose income depended on the oil industry are not entitled to non-probationary restitution because they were only indirect victims of the pipeline shutdown after the spill.

The People of the State of California appeal orders denying restitution after Plains All American Pipeline, L.P. (Plains) was convicted of unlawfully discharging oil into the ocean. The trial court considered restitution for four groups: Group 1 (claims under $10,000), Group 2 (fishers, restaurants, and tourism businesses claiming lost revenue), Group 3 (oil industry claimants consisting of oil platform employees and others who derived income from the surrounding oil industry), and Group 4 (real property claimants alleging their property was damaged by the spill). The People appeal denial of restitution for claimants in Groups 2 and 3.[1]

The People contend the trial court erred when it: (1) concluded oil industry claimants were not direct victims of

---

[1] Plains dismissed its cross-appeal of the restitution order for those Group 2 claimants who were granted restitution. Although the People's briefs discuss restitution claims in Groups 1 and 4, they are not before us because the notices of appeal only challenge rulings regarding Groups 2 and 3.

defendant's crimes, (2) accepted mediated settlements in lieu of restitution, (3) denied restitution to fishers based on a pending class action lawsuit, (4) declined to consider aggregate proof presented by fishers, (5) denied restitution to fishers based on "compelling and extraordinary reasons," (6) refused to consider defendant's criminal conduct, and (7) refused oral victim impact statements.

Additional oil industry claimants in Group 3 sought restitution through private counsel (claimants' counsel). They challenge the denial of restitution in a petition for writ of mandate. We issued an order to show cause and consolidated the writ proceedings with the People's appeal.

We remand for consideration of restitution for four fisher claims. In all other respects we affirm. We deny the writ petition.

FACTUAL AND PROCEDURAL HISTORY

Several oil platforms off the coast of Santa Barbara County pumped oil and gas to onshore pumping stations. Oil from platforms operated by Venoco and ExxonMobil were pumped to the onshore Las Flores facility and then entered Plains Line 901, which ran up the coast and connected to Plains Line 903. Line 903 also transported oil from platforms operated by mining company Freeport-McMoRan. Before Venoco entered an agreement with Plains in 2011 to use Line 901, oil was shipped by barge.

Plains failed to reasonably monitor, maintain, and repair Line 901. The pipeline walls, originally 0.344 inches thick, were corroded 89 percent. The pipeline ruptured near Refugio State Beach on May 19, 2015, spilling over 142,000 gallons of crude oil into the ocean and onto the beach over the course of

approximately 35 minutes.  Line 903 was also corroded but did not rupture.  Regulators ordered Plains to shut down both pipelines until repairs could be approved.

Plains could have replaced the damaged portion of the pipeline and resumed operations in a few weeks, but decided instead to replace Line 901.  Plains then faced regulatory delays.  Neither pipeline has reopened.

Oil platforms that had used Lines 901 and 903 were closed by their operators.  Petitioners presented evidence that workers were laid off because of the pipeline closures.  Plains presented evidence that the closures were largely caused by industrywide economic conditions unrelated to the pipeline closures.

Plains was convicted of causing the discharge of oil into the waters of the state, a felony.  (Gov. Code § 8670.64, subd. (a)(3).)[2] The court did not place Plains on probation.  It sentenced Plains to the maximum fine of $3,347,650.

The court held restitution hearings after entry of judgment. (Pen. Code, §§ 1202.4, subd. (f), 1202.46.)  It ordered that all claims identify "the amount of restitution each claimant seeks" based on spreadsheets and supporting declarations and documents, to be filed six weeks before the restitution hearing. The order did not permit "deviation from this schedule" and prohibited "supplemental claims."

---

[2] Plains was also convicted of misdemeanor counts of knowingly failing to follow an oil spill contingency plan (Gov. Code, § 8670.64, subd. (c)(2)(D)); unlawfully taking a marine mammal, protected bird, and designated fish (Fish & Game Code, §§ 4500, subd. (a), 3511, subd. (a)(1), 2000, subd. (a)); and unlawfully discharging oil to waters or land (Santa Barbara County Code, § 25-37).

The People, represented by the district attorney and the Attorney General, sought restitution for claimants in each group. Claimants' counsel sought restitution for additional claimants in each group. The claimant groups are as follows:

*Group 1: Claims under $10,000*

The trial court concluded that a restitution hearing regarding Group 1 was unnecessary because Plains agreed to pay the claimants "in full." No writ or appeal was filed from this ruling.

*Group 2: Fishers*

This group included fishers who claimed their catch decreased due to pollution from the oil spill, and restaurants and other "tourism industry" businesses that claimed lost revenue due to decreased business purportedly caused by the spill. The People sought restitution for 16 claims from 14 claimants totaling approximately $3.2 million. The claims included a fisherman whose catch decreased; oil damage to the paint of a sailboat; the cost of relocating crab pots; closure of an abalone farm; and decreases in business to a wholesale fish business, charter fishing and whale watching boats, a bait and tackle shop, restaurants, a candy shop, a sunglass shop, and other retailers.

The court ordered $81,294 in restitution to five claimants identified by the People. It denied restitution to one claimant identified by the People and three individual claimants identified by claimants' counsel, concluding they did not suffer any losses because of the spill. The court declined to order restitution for the remaining eight claimants identified by the People whose claims had been resolved through mediation.

Claimants' counsel also sought restitution of over $430 million on behalf of a group of 1,500 to 3,000 unnamed fishers

5

who had been certified as a class in the federal *Andrews* class action (*Andrews v. Plains All Am. Pipeline, L.P.* (C.D.Cal., Nov. 22, 2019, No. 2:15-cv-04113-PSG (JEMx)) 2019 WL 6647928, 2019 U.S.Dist. Lexis 212027).  The court ruled that class members who did not make individual restitution claims in the criminal action were not entitled to restitution.

The court also ruled the criminal restitution hearing was duplicative of the federal class action, the class action was the appropriate forum, judicial resources were better directed there, and there were "compelling and extraordinary reasons" to not order class restitution for the fisher class.  (Italics omitted.)  The court also found that Plains established "that the amount of the loss is other than that claimed."  (Italics omitted.)

*Group 3: Oil industry claimants*

Group 3 consisted of workers and businesses who lost wages or revenue resulting from the oil platform closures.  The People filed nine restitution claims totaling approximately $28.5 million.  Additional oil industry claimants, represented by claimants' counsel, filed another 158 claims seeking approximately $213.5 million in restitution.  They included oil platform workers who lost their jobs when the platforms closed, contractors who provided the platforms with supplies and oilfield services, ships that brought crew and supplies to the platforms, and a Port Hueneme company that fueled vessels that serviced the oil platforms.

Twenty-seven claimants resolved their claims through mediation and stated they withdrew their restitution claims.  The court denied the remaining claims "based on a legal issue common to all those claims," i.e., that they were "not victims of the crimes of which Plains was convicted."

6

*Group 4: Real property claimants*

Group 4 included claimants whose properties were damaged by the oil spill. The only two claims in this group were withdrawn. The People have not appealed any ruling regarding this group, and the writ petition was withdrawn for this group.

*Federal court settlement*

After the restitution orders at issue here, the federal district court in *Andrews* approved a class action settlement of $184 million to resolve the claims of fisher class members and $46 million to resolve those of property class members. Some of the class members included Group 2 restitution claimants. The settlement provided: "[A]ll Class Members have, by operation of this Order, fully, finally and forever released, relinquished, and discharged the Released Parties . . . [¶] Class Members . . . are permanently barred and enjoined from commencing or continuing any action or proceeding in any court or tribunal asserting any claims released under the Settlement Agreement, including any claims for criminal restitution in *People v. Plains All Am. Pipeline, L.P.*, No. 1495091 (Cal. Superior Ct.) and from accepting payment of any Restitution Award in [that case]." (*Andrews v. Plains All Am. Pipeline, L.P.* (C.D.Cal., Sept. 20, 2022, No. 2:15-cv-04113-PSG-JEM) 2022 WL 4453860, 2022 U.S.Dist. Lexis 172155.)[3]

_____

[3] We take judicial notice of the class action settlement in *Andrews*. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) Although the settlement occurred after the restitution orders at issue here, the parties refer to it in their briefs, and it is relevant to the issue of mootness. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813.) However, we deny the parties' request for judicial notice of the rest of the federal court file. The

The writ petition originally sought restitution as to Group 2 (fishers), Group 3 (oil industry claimants), and Group 4 (real property claimants). After the *Andrews* settlement, petitioners in Groups 2 and 4 withdrew their requests for writ relief. We accordingly limit our analysis of the writ petition to Group 3 petitioners. But because the civil settlement is not binding on the People (*People v. Nonaka* (2022) 83 Cal.App.5th 998, 1000), we resolve the People's contentions regarding Groups 2 and 3, including those in Group 2 who settled their claims in *Andrews*.

DISCUSSION

*Right to seek mandamus*

Plains demurs to the mandamus petition (Code Civ. Proc., § 1089) on the ground that the oil industry claimants have no right to seek writ relief because the People have separately appealed. The demurrer is overruled.

Because restitution claimants are not parties in a criminal prosecution, the oil industry claimants have no right to direct appeal. (*Crump v. Appellate Division of Superior Court* (2019) 37 Cal.App.5th 222, 236 (*Crump*).) "Instead . . . where the trial court fails in its duty to order restitution from the convicted wrongdoer to the victims of the crime, the victims may do what petitioners have done in this case: seek a writ of mandate." (*Id.* at p. 230; *Q-Soft, Inc. v. Superior Court* (2007) 157 Cal.App.4th 441, 446-447.)

---

parties have not shown those records are "both relevant to and helpful toward resolving the matters before this court." (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 418.) Nor have they provided us with a copy of the file or other means to access it. (Evid. Code, §§ 453, subd. (b), 459, subd. (a).)

"[W]here the trial court improperly refuses or otherwise errs in awarding restitution, and *no appeal is taken*, the victim may enforce the right to restitution in the appellate courts by seeking a writ of mandate." (*Crump*, *supra*, 37 Cal.App.5th at p. 241, italics added.)  Because the issue was not before it, however, *Crump* did not determine what rights victims would have if, as is the case here, the People appealed.

"When a sentence is invalid due to the omission of a restitution order . . . a victim, the district attorney, or the court on its own motion may at any time request correction of the sentence to include a proper restitution award." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1225, fn. 7.)  "A victim, the retained attorney of a victim, a lawful representative of the victim, or the prosecuting attorney upon request of the victim, may enforce" the constitutional right to restitution "in any trial or appellate court with jurisdiction over the case as a matter of right." (Cal. Const., art. I, § 28, subd. (c)(1).)  Because " 'appellate jurisdiction . . . encompasses review by extraordinary writ as well as review by direct appeal' " (*Crump*, *supra*, 37 Cal.App.5th at p. 241), we conclude the People's appeal does not preclude the oil industry claimants from seeking writ relief.

The demurrer also contends the petition fails to state facts sufficient to show the trial court abused its discretion.  We overrule the demurrer on that ground as well.  "For the purpose of ruling on a demurrer, the court assumes the truth of all well-pleaded allegations of a complaint." (*StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 453, fn. 3.)  The petition alleges that the oil industry claimants are "victims who suffered economic losses as a direct result of Plains' crimes."  It also alleges the trial court erred in denying restitution as a matter of

9

law by misinterpreting the California Constitution and Penal Code.

Mandamus lies to review an abuse of discretion based on misinterpretation or misapplication of applicable law. (*Conservatorship of Lee C.* (2017) 18 Cal.App.5th 1072, 1092.) We conclude the allegations in the petition are sufficient to survive the demurrer.

*Right to restitution*

"It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) "Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B).)

The right to restitution was implemented by Penal Code section 1202.4. It provides: "The court, in addition to any other penalty provided or imposed under the law, shall order the defendant to pay . . . [¶] . . . [¶] [r]estitution to the victim or victims, if any." (Pen. Code, § 1202.4, subd. (a)(3)(B).) "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . The court shall order full restitution." (Pen. Code, § 1202.4, subd. (f).)

When probation is granted, the trial court has broad

10

discretion to order restitution, " 'even when the loss was not necessarily caused by the criminal conduct underlying the conviction.' " (*People v. Martinez* (2017) 2 Cal.5th 1093, 1101 (*Martinez*).) But when probation is not granted, " 'the statute is explicit and narrow." (*Id.* at p. 1102.) In non-probation cases, "a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant *convicted of that crime.*" (Pen. Code, § 1202.4, subd. (a)(1), italics added.)

*Standard of review*

"The standard of proof at a restitution hearing is preponderance of the evidence. . . . [Citation.] We review a victim restitution award for abuse of discretion. [Citation.] '[W]here the specific issue is whether the court's factual findings support restitution, we review those findings for substantial evidence.' " (*People v. Trout-Lacy* (2019) 43 Cal.App.5th 369, 373.)

Because the trial court here denied restitution to the oil industry claimants as a matter of law, we review that order de novo. (*People v. Brunette* (2011) 194 Cal.App.4th 268, 276-277.) The trial court reasoned that the oil industry claimants' losses were caused by Plains's "noncriminal" failure to maintain and monitor the pipeline rather than the resulting spill. "We uphold the trial court's decision if it was correct under any theory of law, even if the announced basis for the ruling was erroneous." (*Fuss v. Superior Court* (1991) 228 Cal.App.3d 556, 561.)

*Whether oil industry claimants were victims*

The People and petitioners contend the trial court erroneously concluded the oil industry claimants were not victims of the crimes of which Plains was convicted. We conclude they

11

were not entitled to restitution based on the elements of the crime, and because these claimants were neither direct victims nor the objects of the crime.

### 1. Elements of crime

Victims are entitled to restitution "from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) "[A] victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant *convicted of that crime.*" (Pen. Code, § 1202.4, subd. (a)(1), italics added.) The right to restitution is based on " 'what conduct is encompassed by the crime.' " (*Crump, supra,* 37 Cal.App.5th at p. 245.) Non-probationary restitution is not available to persons who suffer losses that are merely " 'transactionally related' " to the conviction offense. (*Id.* at p. 246 [no right to restitution for property owners affected by gas leak where defendant convicted of failure to report leak].)

Plains was convicted of violating Government Code section 8670.64, subdivision (a)(3), which prohibits "[k]nowingly engag[ing] in or caus[ing] the discharge or spill of oil into waters of the state, or a person who reasonably should have known that the person was engaging in or causing the discharge or spill of oil into waters of the state." Thus, Plains was convicted of acts it reasonably should have known would discharge oil into the ocean, not acts that would cause employees and businesses to suffer lost wages and income because of third-party oil platform closures.

### 2. Direct victims

The California Constitution provides that "a 'victim' is a person who suffers direct or threatened physical, psychological, or

financial harm as a result of the commission or attempted commission of a crime or delinquent act." (Cal. Const., art. I, § 28, subd. (e).) But this constitutional restitution provision is not self-executing. (*Martinez*, *supra*, 2 Cal.5th at p. 1100, fn. 1.) When first enacted by Proposition 8 in 1982, it provided, "The Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section." (Cal. Const., art. I, § 28, former subd. (b).)

Penal Code section 1202.4 requires restitution to "a victim [who] has suffered economic loss as a result of the defendant's conduct." (Pen. Code, § 1202.4, subd. (f).) The statute does not define "victim." But subdivision (k) of Penal Code section 1202.4 states that "victim" includes (1) "[t]he immediate surviving family of the *actual victim*," (2) a business entity that "is a *direct victim* of a crime," and (3) a "person who has sustained economic loss as the result of a crime" *and* who is a designated relative or household member "*of the victim*." (Italics added.) Thus, restitution is authorized only for "actual" or "direct" victims, and certain family or household members. (*People v. Birkett* (1999) 21 Cal.4th 226 (*Birkett*).[4])

"Nothing in the language or history of the initiative measure compels the conclusion that persons other than the real, actual, immediate, and direct victims of crime have a constitutional right to restitution from the offenders." (*Birkett*, *supra*, 21 Cal.4th at p. 243.) *Birkett* thus concluded that

---

[4] The language interpreted in *Birkett* (former Pen. Code, § 1203.04, subds. (a)(1) & (h)(2), as amended by Stats. 1994, ch. 1106, § 4, pp. 6550, 6552, repealed by Stats. 1995, ch. 313, § 8, p. 1762) is substantially identical to current Penal Code section 1202.4, subdivisions (a)(1) and (k)(1).

13

insurance companies who reimbursed owners of stolen vehicles were not "victims" entitled to restitution. (*Id*. at p. 229.)

To determine who is a direct victim for purposes of restitution, we consider tort principles of causation. (*People v. Jones* (2010) 187 Cal.App.4th 418, 425.) In the civil context, negligently causing a man-made disaster does not impose tort liability for all who foreseeably suffer " 'pure economic loss.' " (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 401 (*Gas Leak Cases*).) "After all, on ' "clear judicial days" ' courts ' "can foresee forever." ' " (*Ibid*.) Our Supreme Court accordingly denied recovery to local businesses who lost customers from the noxious effects of a natural gas leak. (*Id*. at pp.394-397.)

Similarly here, the oil industry claimants were not directly harmed by the oil spillage, but instead by indirect intervening actions. Plains decided to replace Line 901 instead of repairing it, regulators ordered Plains to shut down Line 903 even though it did not rupture, and oil platform operators decided to close after ExxonMobil unsuccessfully sought a permit to transport oil to the refineries by truck.

Public policy considerations support limiting the scope of restitution to direct economic losses here. "Just as in tort law . . . the law must impose limitations on liability for victim restitution other than simple direct causality or else a defendant will face *infinite liability* for [their] criminal acts, *no matter how remote* the consequence." (*People v. Jones*, *supra*, 187 Cal.App.4th at p. 425, italics added.) In *Jones*, the court denied restitution for damage to the victim's vehicle in the courthouse parking lot while she attended a hearing for the charged offense. " '[T]o simply say . . . that the defendant's conduct was a necessary antecedent of the injury does not resolve the question of whether the defendant

14

should be liable.  In the words of Prosser and Keeton: "[T]he consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond." . . . Therefore, the law must impose limitations on liability other than simple causality.' " (*Jones*, at p. 425.)

*People v. Foalima* (2015) 239 Cal.App.4th 1376, upon which the People and petitioners rely, is inapplicable.  Foalima was convicted of murder, but acquitted of arson of the victim's daughter's apartment where the body was found.  The court nonetheless affirmed the restitution order for damages to the daughter's property from the fire.  Because the fire was intended to conceal the murder, the murder was a "substantial factor" and a proximate cause of the loss.  (*Id*. at pp. 1396-1397.)  But this does not mean that restitution is authorized for foreseeable consequences to indirect victims.  *Foalima* did not discuss whether the daughter was a "victim" for purposes of the restitution statute because she came within its provisions as "[t]he immediate surviving family of the actual victim" and a "child . . . of the victim."  (Pen. Code, § 1202.4, subd. (k)(1) & (3)(A).)  In contrast, the oil industry claimants do not come within the definition of "victim" in section 1202.4, subdivision (k).

Nor does *People v. Rojas* (2023) 95 Cal.App.5th 48, 59-62, entitle the oil industry claimants to restitution.  Rojas started a fistfight with the victim, then summoned help from a fellow gang member who shot and killed the victim.  Although Rojas's voluntary manslaughter conviction was reduced on resentencing to assault by force likely to cause great bodily injury, Rojas remained responsible for restitution for the victim's burial expenses.  But unlike the oil industry claimants, the restitution order related to the direct victim of Rojas's crime.

The wide net cast by the oil industry claimants illustrates their ineligibility for restitution.  These claimants include employees and contractors who worked on oil rigs until their operators decided the oil could not be profitably transported without the pipeline.  The Freeport-McMoRan oil rigs did not use Line 901 at all, but used Line 903, which Plains shut down due to maintenance deficiencies, not because of the oil spill.  Claimants, including boat operators that transported supplies to oil rigs, or a company in another county that sold fuel to the boats, may have lost income as indirect consequences of the pipeline shutdown.  But they are not direct crime victims entitled to restitution.  In our view, non-probationary restitution is not authorized for indirect financial losses to oil industry claimants following the oil spill.

### 3. *Object of crime*

The oil industry claimants are also not entitled to non-probationary restitution because they were not the objects of the crime of unlawfully discharging oil into the ocean.

Legislative findings for the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Gov. Code, § 8670.1 et seq.; OSPRA), which includes the conviction offense here, state that California's waters are "treasured environmental and economic resources that the state cannot afford to place at undue risk from an oil spill," and oil spills are "extremely expensive because of the need to clean up discharged oil, protect sensitive environmental areas, and restore ecosystem damage."  (Gov. Code, § 8670.2, subds. (e) & (h).)  "The purpose of this bill [was] to enact a comprehensive plan [to] allow the state to respond quickly, efficiently, and effectively to oil spills in marine waters."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2040 (1989-1990 Reg.

Sess.) as amended Apr. 23, 1990, p. 3.) OSPRA was intended to "provide urgently needed protection for the waters of California." (Stats. 1990, ch. 1248, § 25, p. 5258.) Its purpose was not to reimburse oil industry workers for economic losses resulting from shutting the pipelines and oil platform operators' decisions to close their platforms.

When the electorate enacted the restitution provision of our Constitution, it "was concerned with . . . victims as ordinarily understood, i.e., those *against whom* crimes had been committed." (*Birkett*, *supra*, 21 Cal.4th at p. 243, italics added.) "Insofar as the voters focused on restitution when adopting Proposition 8, it thus seems clear they were concerned with the straightforward principle that those who had suffered loss from *crimes committed against them* should have the right to reparation from the crimes' perpetrators. Nothing indicates the electorate intended to encompass each and every economic consequence that might incidentally be incurred by persons or entities." (*Id.* at p. 244, italics added.) And when the Legislature amended Penal Code section 1202.4, it "foreclose[d] such entitlement by persons whose losses arose only as a result of crimes committed against others." (*Birkett*, at p. 243.) Accordingly, *Birkett* concluded that insurance companies that reimbursed owners of stolen vehicles were not "victims" entitled to restitution. (*Id.* at p. 229.)

Our Supreme Court followed *Birkett* in *People v. Runyan* (2012) 54 Cal.4th 849, concluding the estate of a vehicular homicide victim was not entitled to restitution for the loss in value of its assets. (*Id.* at p. 857.) The court stated, "[T]he estate is not an entity against which defendant committed his alcohol-related offenses of vehicular homicide and injurious

17

driving, and it was not the immediate object of those offenses." (*Ibid*.) *Runyan* reasoned that the estate was not "directly targeted and victimized by defendant's crimes." (*Ibid*.)

The People rely upon *People v. Broussard* (1993) 5 Cal.4th 1067, 1075, which stated that "the Legislature intended the word 'victim,' as used in subdivision (c) of [former Government Code] section 13967, to include *anyone* who . . . has sustained economic loss resulting from a defendant's criminal acts." (Italics added.) But the victims there were the owners of property the defendant stole or received. *Broussard* did not examine whether the purported victims in *Birkett, supra,* 21 Cal.4th at page 233, and *People v. Runyan, supra,* 54 Cal.4th at page 857, were immediate objects of the crimes.

Restitution is limited to a " 'victim,' " defined as "a 'person who is the object of a crime.' " (*People v. Crow* (1993) 6 Cal.4th 952, 957, quoting Black's Law Dict. (5th ed. 1979) p. 1405, col. 2.) The oil industry claimants here were not the objects of the oil spill. This crime was committed against the environment, including sea life, and owners of property damaged by the discharged oil, not oil platform employees and others who derived income from the oil industry. We conclude they are not entitled to restitution.

*Mediated compromises*

The People contend the trial court erred when it failed to order restitution for those victims who settled their claims in mediation. We agree and remand for determination of restitution for four Group 2 claimants, consisting of fishers, who may be eligible for restitution.

The trial court appointed a "Mediator/Settlement Master" for restitution issues and ordered that settlement discussions be

18

"confidential" and not disclosed to the court.[5]  It declined to review the amounts of the mediated settlements.

Several Group 2 fisher claimants settled with Plains.  Some claimants agreed to accept between 3.5 percent and 18.6 percent of their restitution claims.  They released Plains "from any and all claims . . . whether civil, criminal, or administrative."  And they acknowledged the payment "fully satisfies the Claimant's restitution claim, and that the Claimant will not continue to pursue that claim before the Superior Court."  (Bold omitted.)

The court declined to order restitution for ten Group 2 claims that were "settled/resolved" for unstated amounts, presumably through mediation.  It also declined to order restitution for 27 Group 3 oil industry claimants because they were "resolved" and "withdrawn."  The court erred.

Civil liability and criminal restitution serve different interests.  " 'Just as a restitution order pursuant to the criminal law is not a substitute for a civil action to recover damages [citation], a partial civil settlement is not a substitute for restitution in a criminal proceeding.' "  (*People v. Grundfor* (2019) 39 Cal.App.5th 22, 28 (*Grundfor*).)  A civil settlement is between the victim and the defendant, but a "restitution order [is] between [the defendant] and the state."  (*Ibid*.)  "While the release may [relieve the defendant] from further *civil* liability, it [does] not relieve [the defendant] from paying *criminal* restitution."  (*Ibid*.)  Thus, a civil settlement "could no more

---

[5] Communications during mediation are confidential only in "noncriminal proceeding[s]."  (Evid. Code, § 1119, subds. (a) & (b).)  Public policy favors open judicial hearings in criminal cases.  (*People v. Woodruff* (2018) 5 Cal.5th 697, 757; Cal. Const., art. I, § 29 [People's right to public trial].)

'release [a defendant] from [their] financial debt to the state any more than it could terminate [their] prison sentence.' " (*Ibid*.) Amounts paid to a victim in a civil settlement provide no more than an offset for the restitution amount. (*People v. Nonaka*, *supra*, 83 Cal.App.5th at p. 1002.)

Unlike a civil settlement, "[r]estitution 'may serve the salutary purpose of making a criminal understand that he has harmed not merely society in the abstract but also individual human beings, and that he has a responsibility to make them whole.' " (*People v. Cookson* (1991) 54 Cal.3d 1091, 1097.) "[R]estitution serves valid punitive, deterrent, and rehabilitative objectives by . . . helping [them] appreciate the harm done to the victim." (*Ibid*.; *Grundfor*, *supra*, 39 Cal.App.5th at pp. 28-29.)

"A victim's right to restitution is . . . a constitutional one; it cannot be bargained away or limited, nor can the prosecution waive the victim's right to receive restitution." (*People v. Gross* (2015) 238 Cal.App.4th 1313, 1318.) "The Legislature left no discretion or authority with the trial court or the prosecution to bargain away the victim's constitutional and statutory right to restitution." (*People v. Valdez* (1994) 24 Cal.App.4th 1194, 1203.)

But the trial court here did just that. It appointed a mediator with power to negotiate "settlement" of restitution claims and accepted the settlements without making the required showing that the payments "fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (Pen. Code, § 1202.4, subd. (f)(3).)

The court did not "analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered." (*People v. Giordano* (2007) 42 Cal.4th 644, 664.) Nor was the amount of restitution

"in an amount established by court order" based on a "showing to the court." (Pen. Code, § 1202.4, subd. (f).) A sentence that provides less than " 'full restitution' " is invalid. (*People v. Bernal* (2002) 101 Cal.App.4th 155, 164-165.)

By refusing to order restitution for those claimants who settled their claims through mediation, the court did not comply with the mandate that "[r]estitution shall be ordered . . . in every case . . . in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B); Pen. Code, § 1202.4, subd. (f).) Instead, the court erroneously accepted settlements as a substitute for criminal restitution. (*Grundfor*, *supra*, 39 Cal.App.5th at p. 28.)

We conclude the court was required to order restitution for commercial fishers in Group 2 who could demonstrate losses from the crime. " '[C]ommercial fishermen' whose livelihoods depend on the flourishing of aquatic life in the commons of the sea" are direct victims "for the 'diminution of aquatic life' caused by an oil spill." (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 406, citing *Union Oil Co. v. Oppen* (9th Cir. 1974) 501 F.2d 558, 570.) "This long recognized rule (the right of fishermen to recover their share of the prospective catch) is no doubt a manifestation of the familiar principle that seamen are the favorites of admiralty and their economic interests entitled to the fullest possible legal protection." (*Union Oil*, at p. 567.) This liability is for "a pecuniary loss of a particular and special nature, limited to the class of commercial fishermen," and does not extend to recreational fishers. (*Id.* at p. 570.)

But not all claimants who mediated civil settlements are entitled to restitution. "Not 'every decline in the general commercial activity of every business' nearby . . . [is] 'a legally cognizable injury for which the defendants may be responsible.' "

(*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 406.)  There, our Supreme Court concluded the utility responsible for a gas leak did not have tort liability for the reduction in customers and lost earnings of local restaurants, gas stations, retailers, and other businesses. (*Id*. at pp. 394-397.)  We apply this tort principle, and our analysis above regarding the oil industry claimants, to Group 2 restaurants and shops not directly tied to the commercial fishing industry and conclude they are not entitled to restitution.

Accordingly, the order denying restitution to the following four Group 2 claims based on mediated settlements is reversed and remanded for the trial court to determine entitlement to restitution: Chantal Haines (Chantal Seafood Wholesaler), Eric and David Shogren (lost crab fishing revenue, damage to boat, etc.), Miguel Angel Franco (fish wholesaler, Santa Barbara Seafood Company), and David Albaum and Douglas Bush (Cultured Abalone Farm).  No remand is required regarding the following Group 2 claimants because they do not claim damage to property from the oil spill and are not commercial fishers: Neil Bruskin (Mother Sterns Candy Co.), Neil Bruskin (Nature's Own Gallery), Jan Hendrickson and John Devereaux (Read 'N Post), David Bacon (Wave Walker Charters), David Bacon (Hook Line & Sinker), and Hiroko Benko and Kevin Goodwin (Condor Express Tours).  Nor is remand required for the Group 3 oil industry claimants because they are not entitled to restitution as a matter of law.

*Effect of pending federal case*

The People contend the trial court erroneously relied on the then-pending federal class action to deny restitution to Group 2 claimants (fishers).  We agree, but conclude the error is harmless because the claimants did not establish loss.

22

The principles discussed above regarding mediated settlements apply equally here. "Since restitution orders and civil judgments are issued for different purposes, a victim suffering from economic losses as a result of a criminal act has a right to both." (*Vigilant Ins. Co. v. Chiu* (2009) 175 Cal.App.4th 438, 445.) The court may not "substitut[e] the uncertain prospect of a civil recovery for the victim's constitutional 'right to restitution.'" (*People v. Bufford* (2007) 146 Cal.App.4th 966, 971; *In re Brittany L.* (2002) 99 Cal.App.4th 1381, 1390.) The criminal court is obligated to order restitution even though it "may require complicated calculations or result in large restitution awards" or "may be complex." (*People v. Giordano*, *supra*, 42 Cal.4th at p. 661.)

But as we explain below, the court's error is harmless because the aggregate Group 2 claimants did not identify each victim and prove each loss. Substantial evidence also supports the court's order denying restitution to the unnamed members of Group 2.

*Proof of loss*

The People contend the trial court improperly refused to consider the aggregate proof of loss presented by the fisher group. We disagree for two reasons. First, the court properly declined to order restitution to unidentified members of a group. Second, substantial evidence supports the conclusion that financial loss was not established.

Claimants presented expert declarations regarding the aggregate loss to fishers as a group based on reduced catch from the oil spill. Dr. Igor Mezić, a professor of mechanical engineering and mathematics, calculated how much oil moved

23

into different fishing blocks.[6]  An economics professor, Peter Rupert, Ph.D., calculated the aggregate lost profits from the "lost catch" from the date of the spill through the end of 2017 as $202,509,788, based on the number of fish that would have been caught without the oil spill, accounting for factors such as climate and weather patterns.  Claimants did not name the affected fishers or specify the amount of loss to each.  Plains presented conflicting expert declarations.

### 1. *Restitution to group*

Claimants' counsel stated the identity of the class members could be "readily identified" through California Department of Fish and Wildlife (CDFW) records of fish caught in affected fishing blocks.  Counsel stated the federal court ordered CDFW to produce its records but prohibited counsel from publicly filing the victims' names.  (See Fish & Game Code, § 8022, subd. (b).)  They said they were willing to list the individual fishers if the court made an order allowing it.  Claimants requested that restitution be paid to their counsel and the People, who would then distribute the award to class members based on CDFW "fish ticket" records of catch volume and prices.  The court ruled that claimants' counsel could have submitted claims on behalf of individual fishers but did not do so.  It found the declarations and arguments submitted by Plains were more persuasive, and the amount of loss was other than that claimed.

The trial court declined to award restitution to the *Andrews* federal class that was certified for settlement purposes.  That settlement class was defined as those persons who owned or

___

[6] Fishing blocks are numbered grid squares in an ocean map shown in Department of Fish and Wildlife fisheries charts. (See Cal. Code Regs., tit. 14, § 705.1, subd. (d).)

24

worked on vessels who caught fish in designated areas, and those who purchased and resold those fish. It overlapped with, but was not identical to, Group 2, which included fisher claimants identified through CDFW records "and related folks, either fishermen or restaurants or other sort of fishing-related claims."

The People contend the evidence provided the court with a "rational method . . . reasonably calculated to make the victim whole." They characterize the court's refusal to order restitution based on CDFW records as an improper demand for a "particular kind of proof." They rely upon *People v. Kelly* (2020) 59 Cal.App.5th 1172, 1181, which concluded that Penal Code section 1202.4 " 'does not, by its terms, require any particular kind of proof.' " *Kelly* held the trial court's reliance on billing records and declarations was a permissible " 'rational calculation method' " to determine the amount of attorney fees and costs incurred as the result of the defendant's misconduct. (*Kelly*, at pp. 1182-1183.) But while section 1202.4 does not specify a "particular kind of proof," *Kelly* does not eliminate the trial court's discretion to determine the kind of proof it will use as part of its "rational method" to determine restitution.

There is conflicting authority whether the court may make a restitution order to a group rather than to individual victims. In *People v. Ortiz* (1997) 53 Cal.App.4th 791 (*Ortiz*), numerous Latin American musicians were harmed by the defendant's sale of counterfeit music tapes. Our colleagues in Division 7 affirmed a restitution award to a nonprofit trade association in lieu of the individual victims. They reasoned: "[W]here there are numerous victims of the defendant's criminal activity and those victims are foreign residents, it may be impracticable if not impossible for each of them, individually, to discover and seek restitution for

25

crimes involving their property interests in California. Unless they can bind together to seek restitution under one representative organization, these crime victims effectively could be denied the compensation to which they are entitled and the defendant could escape [its] responsibility to make restitution for the economic loss [it] has caused." (*Id*. at p. 797.)

But in our view, *Ortiz*, *supra*, 53 Cal.App.4th 791, does not require ordering restitution on an aggregate basis here. Because *Ortiz* was a probationary order, the court there had greater leeway to fashion a restitution order. (*Martinez*, *supra*, 2 Cal.5th at pp. 1101-1102.) And unlike *Ortiz*, the individual claimants here could have been identified. Claimants' counsel stated the identity of the class members could be "readily identified" through CDFW records.[7] While *Ortiz* affirmed the trial court's exercise of discretion in ordering restitution, it does not mandate that courts exercise their discretion to award restitution to a representative group.

In *People v. Kelly* (2010) 189 Cal.App.4th 73, 77, the Fourth District, Division 2, declined to follow *Ortiz*, *supra*, 53 Cal.App.4th 791, and suggested it was "wrongly decided." Like *Ortiz*, *Kelly* dealt with counterfeit music recordings but held that a trade association was not a victim and reversed the order awarding it restitution.

We conclude that an aggregate restitution award to class members distributed by claimants' counsel would not comply

---

[7] Counsel stated they were "familiar with . . . the identities of likely class members" and were "well-equipped to supply notice" to victims who had not yet submitted claims. In *Andrews*, counsel represented that "notice to the class was manageable," and they provided notice to members through direct mail.

with section 1202.4 because "[t]o the extent possible" the court must "identify each victim and each loss to which it pertains." (Pen. Code, § 1202.4, subd. (f)(3).) "[S]ome evidence of the harm incurred by the *particular victim* of the crime is required to support a victim restitution award. '[A] crime victim may recover only for losses *personally incurred by that victim.*' (*People v. Runyan* (2012) 54 Cal.4th 849, 859; [other citation omitted].) . . . [I]t is insufficient that the *average victim* would suffer injury from a particular type of crime." (*People v. Gomez* (2023) 97 Cal.App.5th 111, 118.) And here, no evidence of individual losses was presented.

Nor do we agree with the People's contention that the *Andrews* settlement class was eligible for restitution pursuant to Penal Code section 1202.4, subdivision (k)(2). The organizations listed in that provision are fictitious persons or other business entities. "[W]e presume the Legislature knows an association is an *organization* of people or other entities joined for a common purpose." (*Ortiz*, *supra*, 53 Cal.App.4th at p. 796, italics added.) In contrast, a certified class is a group of separate individuals with a "community of interest" in civil litigation, not an entity that is a direct victim of a crime. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435; Pen. Code, § 1202.4, subd. (k)(2).)

We decline the People's invitation to apply class action principles to awarding criminal restitution to unnamed class members. We conclude the trial court did not abuse its discretion when it declined to order restitution in unspecified amounts to unidentified class action participants.

### 2. *Substantial evidence*

Substantial evidence also supports the trial court's finding that the aggregate Group 2 claimants did not establish financial

27

loss.

Plains presented the expert opinion of forensic accountant Avram S. Tucker, who compared the pre- and post-oil spill revenues and profit margins of fishers. He concluded, "Dr. Rupert's conclusion that the oil spill caused *any* reduced revenue or lost profits realized by fishers and fish processors is unsupported and unreliable." (Italics added.)

Plains also presented a declaration from Ann Michelle Morrison, Sc.D., an expert in ecological and biological sciences. She stated that Dr. Rupert's methodology was flawed. She concluded that any impacts from the spill were of "short duration," and noted the affected fishing blocks were reopened 41 days later. She also opined that climate and weather events and "long-term fishery management decisions" were the most likely causes of any observed decline in fish harvests. She concluded that "Line 901 oil exposure would have been insufficient to have affected the reported harvests or measured abundances of any of the fishery resources in the class blocks."

The court found the declarations submitted by Plains more persuasive than those submitted in support of Group 2 claimants. It stated, "The Court found all the declarations submitted by Plains persuasive, particularly the declaration of Ann Michelle Morrison." (Italics omitted.) "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) Substantial evidence supports the trial court's conclusion.

*Compelling and extraordinary reasons*

The People also contend the trial court erroneously denied restitution to Group 2 claimants (fishers) by relying on the exception for "compelling and extraordinary reasons." The

28

exception has been eliminated from article I, section 28, subdivision (b) of California Constitution (Prop. 9, as approved by voters, Gen. Elect. (Nov. 4, 2008) § 4.1) and retroactively from Penal Code section 1202.4 (Stats. 2016, ch. 37, §§ 3 & 5). But we conclude the error is harmless. Restitution was properly denied based on the failure to establish individual losses for Group 2 and the trial court's weighing of conflicting evidence.

*Consideration of criminal conduct*

The People also contend the trial court erred in refusing to consider the nature of the defendant's criminal conduct, prior history of violations, lack of remorse, resistance to paying compensation, and the purported inadequacy of the fine imposed. We disagree.

In the hearing regarding the Group 2 fisher claims, the court noted Plains's "many efforts to avoid responsibility" and its "significant blame for . . . what happened . . . and what happened thereafter. [¶] But in fixing restitution, I have taken the approach that I will do it on a clean sheet approach. I don't think that because a particular defendant's action was horrible, terrible, whatever word you want to put at it, that the restitution should necessarily be bigger or larger or doubled. I think the restitution should be based upon the facts that the Court considers in making an appropriate restitution number." The court continued, "[I]rrespective of what the facts might be concerning the egregious nature of the underlying case, I am not fixing restitution based on that. I am taking a look at what the evidence is that's presented on the issue of restitution as if it was a new book, not only a new chapter, but a new book, trying to determine what's reasonable and fair for restitution only."

The trial court did not err in declining to consider these

29

factors.  Because probation was not granted, the statutory right to restitution is " 'explicit and narrow.' " (*Martinez, supra*, 2 Cal.5th at pp. 1101-1102.)  Thus, restitution must be based on the "determined economic loss incurred as the result of the defendant's criminal conduct."  (Pen. Code, § 1202.4, subd. (f)(3).)  "A trial court has no discretion over the issuance of the [restitution] award itself [citation] and 'really very little discretion' over the amount of the award [citation].  'The statute requires the award be set in an amount which will fully reimburse the victim for [their] losses . . . .' " (*People v. Brown, supra*, 147 Cal.App.4th at p. 1225.)

*Victims' right to be heard*

The People and petitioners contend the trial court also erred in not allowing Group 3 claimants to give oral impact statements.[8]  We agree.

Whether the court is required to hear oral statements by claimants has two components: the evidence necessary for the court to determine restitution, and their right to make an impact statement.

On the first issue, the court properly exercised its discretion to base its decision on documentary evidence.  Restitution is "based on the amount of loss claimed by the victim or victims or any other showing to the court."  (Pen. Code, § 1202.4, subd. (f).)  The court " 'may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole.' " (*People v. Millard* (2009) 175 Cal.App.4th 7, 26; *People v. Baumann* (1985) 176 Cal.App.3d

---

[8] This issue is not pertinent to Group 2 claimants because the record does not show the trial court denied them the right to make oral impact statements.

30

67, 80.) "[A] trial court has sufficient discretion to appropriately limit the evidence admitted at a victim restitution hearing to avoid an unduly prolonged and involved hearing." (*Millard*, at p. 42.) It may make a restitution order based on "truncated evidence" such as declarations or probation reports, business records, and checks. (*Ibid*.; *Baumann*, at pp. 81-82.)

Claimants here submitted thousands of pages of declarations and supporting documentation. In our view, the court's consideration of that evidence "afforded a full, extensive fair hearing on the issue of restitution." (*People v. Baumann*, *supra*, 176 Cal.App.3d at p. 82.)

The second issue is the claimants' constitutional right to address the court. Several claimants gave oral victim impact statements. The court did not allow additional oral victim impact statements, stating that presentations had been made by "very involved and experienced competent lawyers." The trial court erred.

The request that additional Group 3 claimants be heard was for a "proceeding in which a right of the victim [was] at issue" where victims had a right "[t]o be heard." (Cal. Const., art. I, § 28, subd. (b)(8).) When these requests were made, the court had issued a *tentative* ruling that Group 3 claimants were not victims for purposes of restitution. But these claimants should not have been deprived of their right to be heard on a contested issue before the final restitution ruling was made.

"It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to *seek* and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A), italics added.) This provision does not limit the right to be heard

31

to direct victims. In *Crump*, *supra*, 37 Cal.App.5th at page 234, our colleagues in Division 8 held that purported victims impacted by a gas leak had the right to be heard despite the trial court's conclusion they were not victims entitled to restitution.

There is conflicting authority whether a victim's right to be heard includes the right to make an oral presentation. (Compare *People v. Hannon* (2016) 5 Cal.App.5th 94, 103 [declining to decide]; *Kenna v. U.S. District Court* (9th Cir. 2006) 435 F.3d 1011, 1016 [right to orally address court, based on legislative history of federal statute]; *United States v. Marcello* (N.D.Ill. 2005) 370 F.Supp.2d 745, 747-748 [no right to oral statement].)

We conclude that victims seeking restitution have the right to orally address the court. Marsy's Law entitles victims to be heard, even when it "will not alter the outcome" of the hearing. (*In re Vicks* (2013) 56 Cal.4th 274, 310 [victim statement at parole hearing].) Respecting victims' right to address the court treats them with dignity and recognizes their importance as participants in the case. (*Ibid*.) It may also serve a healing cathartic effect and reduce victims' feelings of depersonalization and bitterness. (*United States v. Blake* (E.D.N.Y. 2000) 89 F.Supp.2d 328, 351; Sen.Rep. No. 105-409, 2d Sess., pp. 17, 28 (1998) [1998 WL 723953] [Senate report proposing Constitutional amendment for crime victims' rights]; Comment, *The Larry Nassar Hearings: Victim Impact Statements, Child Sexual Abuse, and the Role of Catharsis in Criminal Law* (2023) 82 Md. L.Rev. 782, 795-797.)

We are not persuaded by Plains's contention that it is sufficient to allow victims to be "heard" in writing. The findings and declarations of Marsy's Law, which added the victim's right to be heard to the state Constitution, lamented the prior "failure to provide [crime victims] with an opportunity to *speak* and participate." (Prop. 9, as approved by voters, Gen. Elect. (Nov. 4,

2008) § 2, ¶ 9, quoted in *In re Vicks*, *supra*, 56 Cal.4th at p. 282, italics added.)

Victims "have the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express . . . their views concerning the crime, the person responsible, and the need for restitution." (Pen. Code, § 1191.1, enacted (with minor wording differences) by Prop. 8, as approved by voters, Primary Elect. (June 8, 1982) § 6; see Pen. Code, § 679.02, subd. (a)(3).) This provision "mandate[s] a previously optional procedure, to *require* the judge to *listen to* and consider the views of the victim." (*People v. Zikorus* (1983) 150 Cal.App.3d 324, 331, second italics added.)

But we nevertheless conclude the error is harmless because the Group 3 oil industry claimants are not entitled to restitution as a matter of law. Thus, in the specific circumstances of this case, the failure to allow oral victim impact statements by oil industry claimants does not form a basis for reversal or writ relief. On remand, however, the court must allow the four Group 2 claimants whose restitution is at issue to make oral impact statements if requested.

*Conclusion*

The trial court properly denied restitution to the Group 3 oil industry claimants as a matter of law. The court properly denied restitution to unidentified members of Group 2 fisher claimants on an aggregate basis. As to the four specific Group 2 fisher claims identified above, the court must order full restitution for economic loss suffered as a result of the crime. (Pen. Code, § 1202.4, subd. (f).)[9]

---

[9] A footnote in appellant's opening brief states that their contentions also apply to Group 4 real property claimants.

## DISPOSITION

We reverse the denial of restitution to the four Group 2 claimants identified above and remand for the trial court to determine their right to restitution in accordance with the principles stated in this decision. In all other respects, the restitution orders are affirmed.

The petition for writ of mandate is denied and the order to show cause is discharged. Each party shall bear its own costs.

<u>CERTIFIED FOR PUBLICATION.</u>

BALTODANO, J.

We concur:

GILBERT, P. J.          YEGAN, J.

---

Because the Attorney General appealed only the orders regarding Groups 2 and 3, issues regarding Groups 1 and 4 are not before us. (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1315-1316.) Appellant also contends that on remand, the trial court must permit new claims by any victim. We decline to address this issue because it was raised for the first time in the reply brief. (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.)

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Appellant.

Munger, Tolles & Olson, Henry Weissmann, Donald B. Verrilli, Jr., Elaine J. Goldenberg, Daniel B. Levin and Sarah Weiner for Defendant and Respondent.

Cappello & Noël, A. Barry Cappello, Leila J. Noël, Lawrence J. Conlan; Lieff Cabraser Heimann & Bernstein, Robert J. Nelson, Nimish R. Desai, Wilson M. Dunlavey; Keller Rohrback, Juli Farris, Matthew J. Preusch; Audet & Partners, William M. Audet and Ling Y. Kuang for Petitioners.

No appearance for Respondent in No. B317229.

Munger, Tolles & Olson, Henry Weissmann, Elaine J. Goldenberg, Daniel B. Levin and Sarah Weiner for Real Party in Interest Plains All American Pipeline, L.P.

No appearance for Real Party in Interest The People.

No appearance for Real Party in Interest James Buchanan.