Filed 5/28/24  D.S. v. Superior Court CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| D.S.,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>　　　　Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　　Real Party in Interest. | B335126<br><br>(Los Angeles County Super. Ct. No. 22CCJP03402A) |

　　　　ORIGINAL PROCEEDING.  Petition for extraordinary writ. (Cal. Rules of Court, rule 8.452.)  Cathy J. Ostiller, Judge.  Petition denied.

　　　　Los Angeles Dependency Lawyers, Inc., Law Office of Amy Einstein, Dominika Campbell and Christina Curtis for Petitioner.

　　　　Disability Rights Education and Defense Fund, Claudia Center and Kavya Parthiban for Disability Rights Education and Defense

Fund, CripJustice, Disability Rights California, Legal Aid Association of California, Legal Aid at Work, and Public Counsel, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Senior Deputy County Counsel, for Real Party in Interest.

Children's Law Center of California—CLCLA1, Daniel Szrom for Minor.

_____

D.S., the father of D.S.L., petitions for extraordinary relief pursuant to California Rules of Court, rule 8.452.  He seeks review of an order terminating reunification services and setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1] We deny the petition.

## FACTS AND PROCEDURAL HISTORY

D.S.L. was born in Los Angeles County in December 2021. Father and the mother of D.S.L., J.L. (Mother), lived together for a time prior to and after D.S.L.'s birth, including at Father's home in Michigan.  The two split up when D.S.L. was approximately five months old, however, and Mother returned with D.S.L. to her home in the Los Angeles area, while Father remained in Michigan.

### Detention

The Los Angeles Department of Children and Family Services (DCFS) filed a section 300 petition in August 2022.  It alleged, in part, that then eight-month-old D.S.L. suffered a skull injury, with trauma to the brain.  Bruising and abrasions on other parts of the body, including the child's face and arm were also observed, as were bite

---

[1] Further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

marks to the body. D.S.L. was found limp and motionless and required emergency medical treatment. Mother's claims that the injuries were accidental were not consistent with the type or extent of the injuries.

Mother's new boyfriend was arrested for the injuries to D.S.L. Mother stated that she was in the bathroom when her boyfriend brought the motionless child to her, prompting the two of them to take D.S.L. to the emergency room.

The juvenile court ordered D.S.L. detained on August 31, 2022. Father was found to be the presumed father of the child.

**Jurisdiction and disposition**

Soon after learning of the injuries to D.S.L., Father, along with his own mother, traveled from Michigan to California. Father had no known criminal history, and no child welfare history as a parent. His mother, however, had an extensive child welfare history in Michigan, including numerous allegations of drug and alcohol abuse, neglect of Father as a minor and his minor siblings, failure to maintain her children's hygiene, and housing them in a filthy environment. There were also repeated reports that Father was malnourished as a child and his mother failed to provide him with a functioning feeding tube necessary for his nourishment. Possible effects of father's apparent malnourishment continued into adulthood, as at the time of these proceedings in 2022, Father, who was born in 1999, weighed approximately 60 pounds with a height of 63 inches. Father's slight stature could also potentially be explained by medical issues, including a diagnosis for Crohn's disease. By his own admission, Father was lacking in physical strength.

When interviewed by a DCFS social worker, Father stated that he was ready and able to care for his son, and that he had a strong family support system, including his mother, who lived next door to him in Michigan. Father stated that he had a substantial income from being "famous" on social media, and that he and Mother had made additional money by posting pornographic videos of themselves on the

3

Internet.  Father and his mother both provided on demand drug tests.  While Father tested negative, his mother tested positive for marijuana.

Father consistently visited with D.S.L. following the detention hearing.  He held and played with the child and was observed to be "kind," though he needed direction on how to provide care and struggled with holding the baby.

An amended section 300 petition was filed in October 2022.  It alleged, with respect to Father, that he and Mother had a history of violent altercations, and that Father failed to take protective action even though he knew that Mother used drugs and that the child was in danger.  It further alleged that Father was "unable to provide the child . . . with ongoing appropriate supervision due to the father being unable to understand nor being able to physically meet the high medical needs of his child who will require ongoing medical intervention. . . .  Father lacks knowledge of basic child development and capacity to maintain physical safety for a medically fragile child."  Finally, the amended petition alleged that Father had created a dangerous home environment by keeping firearms that were not safely locked.

The amended allegations were based, in part, on an interview with Mother.  Mother reported that she frequently had to repeat things to Father because he did not understand them, and that he did not help change D.S.L.'s diaper or help with other childcare tasks both because he did not want to and because he did not know how.  Mother stated that Father's apartment in Michigan was filthy, that numerous family members lived with him, including a registered sexual offender, and that Father relied on his mother to complete basic tasks for him, including cleaning himself.  Father denied most, but not all, of Mother's statements.  Father stated that while he had a learning disability and did not progress past middle school, he had learned to spell from the Internet and could learn to take care of D.S.L.  Father additionally stated that he was able to hold D.S.L., feed him, and change his diaper.  According to Father, his mother is his "support."

A DCFS Multi-disciplinary Assessment Team (MAT) assessor stated that she was concerned with the ability of Father to care for D.S.L. The assessor believed that Father had an inability to problem solve and needed step-by-step instruction. He "demonstrated an inability to safely care for a high risk and medical needs baby." During a visit, Father left the baby unattended on the carpet for over five minutes, left him alone on the changing table without being strapped in, did not display efforts to soothe the baby when he was crying, and requested that hospital staff hold and carry the baby. Father did show affection toward D.S.L., however, and fed and played with him.

Due to his severe, life-threatening injuries, D.S.L. was determined to be high-risk for significant delays in speech, cognition, motor development, and feeding. He was also diagnosed as high-risk for hemi-paretic cerebral palsy, and had exhibited decreased right-side arm and leg movements. D.S.L., who was a healthy baby prior to the injuries, was now likely to have permanent disabilities. He required extensive rehabilitation, including speech therapy, physical therapy, occupational therapy, and behavioral therapy.

In November 2022, Father's aunt informed DCFS that she and her husband wished to become D.S.L.'s caregivers at their home in Michigan, with a concurrent plan of adoption. A home study was requested. D.S.L. continued to be placed in foster care in the Los Angeles area.

In January 2023, DCFS informed the juvenile court that Father's visitations with D.S.L. had been consistent. Father still had difficulties in providing care to D.S.L., however. He attempted to have the child drink out of a sport top water bottle, which D.S.L. could not do, and attempted to feed the child Vienna sausages, which were too hard. DCFS was concerned with Father's ability to comprehend the child's limitations.

D.S.L. was diagnosed with hemiparetic cerebral palsy in February 2023, with the entire right-side of his body affected. He

would potentially need lifetime therapeutic services. Father had attended about half of D.S.L.'s therapy sessions. The occupational therapist reported that Father was very polite and would do anything requested of him, but did not demonstrate any retention of the training provided him. Father had not attended any of D.S.L.'s physical therapy sessions and had only sporadically attended medical appointments. He did enroll in parenting classes, however.

The adjudication hearing was held in March 2023. Per Father's counsel's request, certain allegations pertaining to Father were struck from the operative section 300 petition: that Father and Mother had engaged in violent altercations, that he failed to protect D.S.L. from physical abuse he might suffer with Mother, and that he was unable to care for D.S.L. due to his own limitations. The juvenile court sustained two counts pertaining to Father: that he failed to take action when he knew or should have known of Mother's drug use, and that he created a detrimental home environment by keeping unsecured firearms in his home. Numerous counts were sustained as to Mother, including that D.S.L.'s injuries were a result of her deliberate, unreasonable, and neglectful acts, and that she abused drugs, rendering her incapable of providing D.S.L. with regular care and supervision.

Prior to the disposition hearing, DCFS reported that Father continued to consistently visit with D.S.L., and no concerns with the visitations were noted. Father told the social worker that he had begun giving his guns away to a friend with a license. He had still been sporadic in attending the child's medical and therapeutic appointments, however. D.S.L.'s caregiver reported that Father struggled to keep a schedule and prioritize D.S.L.'s needs. The caregiver repeatedly provided Father with the dates and locations of appointments, but Father did not keep a calendar and relied on others to tell him what to do. The caregiver was also concerned with Father's comprehension of D.S.L.'s ongoing risks and needs. Among other

6

things, Father appeared to believe that D.S.L.'s cerebral palsy would not be a concern until he entered kindergarten.

At the close of the disposition hearing, on April 4, 2023, the juvenile court ordered D.S.L. removed from Father and Mother. Both parents were ordered to be provided with reunification services. Father's reunification services were to include monitored visitation, parenting classes for special needs children, and individual counseling. He was also ordered to attend and participate in all of D.S.L.'s medical and developmental appointments. Additionally, the court ordered that Father undergo psychological and neurological testing pursuant to Evidence Code section 730. The testing and the ensuing report were to address Father's developmental and cognitive abilities, and "how that may affect care for a child with high medical needs."

**Post-disposition events**

By June 2023, Father had completed one parenting program and had recently enrolled in another. His visits with D.S.L. continued to go well, with no recent concerns regarding their interactions, and with Father properly feeding, nurturing, and supervising the child. Additionally, Father's attendance at D.S.L.'s appointments had improved.

As of September 2023, however, Father had still not enrolled in individual counseling. DCFS continued to express concerns regarding Father's ability to care for a child with disabilities. Father was observed to be heavily reliant on his mother for support, as she appeared to provide him with assistance retaining and understanding information relating to D.S.L.

D.S.L. had shown improvement in his therapeutic sessions. By September 2023, his physical and occupational therapists reported that he was walking and might regain full motion in his legs. His right arm was still partially paralyzed, however. The chances of him regaining full use of his right arm were marginal. Both therapists stated that

Father attended every session and was engaged, supportive, and receptive.

Toward the end of September 2023, however, D.S.L.'s pediatrician reported that Father did not understand the severity and extent of the child's diagnosis and lifelong concerns. She stated that Father did not pay attention during medical visits and did not show concern or competency. The doctor believed that Father lacked the mental and physical capacity to care for D.S.L.

A DCFS social worker who observed a visit between Father and D.S.L. in October 2023 reported that Father acted appropriately during the visit. However, Father did not seem able to initiate play with D.S.L., and Father spoke to the social worker more than he interacted with the child. Father changed D.S.L.'s diaper during the visit, but left the diaper on the carpet for about 20 minutes before throwing it away.

Father underwent a neurological examination in November 2023. The report stated that Father had a history of failure to thrive syndrome. It further stated: "Currently there seems to be no contraindication to his being a caretaker and he doesn't seem to need further neurologic care."

By the end of November, Father had begun individual counseling. Additionally, the home study of Father's aunt and her husband in Michigan was approved. Father told the social worker that he agreed with D.S.L. being placed with the aunt if the child could not be returned to Father's care.

D.S.L. continued to undergo further medical examination. His pediatrician reiterated that he would most likely need lifelong support and therapeutic services. In addition to his physical symptoms, D.S.L. had trouble controlling salivation and was diagnosed with "global developmental delay." His vocabulary consisted of about 15 words, and he was unable to put two words together, which was unusual for a child of his age. A recent scan indicated that D.S.L. had sustained significant loss in brain volume due to brain bleeds caused by his

8

traumatic injury.  The pediatrician advised that D.S.L. would require further cranial surgery.  Additionally, D.S.L.'s skull fracture had never properly healed and he was being fitted for a helmet.  The pediatrician reported that, due to the injuries, D.S.L. was at risk for further, future medical, developmental, and behavioral problems, including moderate to severe intellectual disability, seizure disorder, and lack of motor skill strength.  He was also at risk for developing mental health issues, such as major depressive disorder, oppositional defiant disorder, and self-injurious behavior.

The pediatrician additionally noted that D.S.L. was currently housed in a "unique" situation, since one of his foster parents was an occupational therapist, and he received constant care and supervision. The foster parents ensured that the child attended all of his many appointments.  The pediatrician was concerned whether Father would be able to provide an adequate level of care and supervision.

The neurocognitive and psychological report of Father, ordered in April 2023, was finally completed in January 2024.  The assigned psychologist reported that she had "grave concerns" with D.S.L. being placed with Father.  Her report stated that Father "shows perseverance, understanding of basic language, ability to communicate his thoughts and wishes, and a slow but persistent wish to learn. While he can grasp concepts over time, he is remarkably slow to learn, and he becomes lost without a structured approach being provided." When given a "structured, non-verbal reasoning task," Father scored at the first percentile (one out of 100) in "learning to learn."  This "very low score" was "consistent with his limited capacity to use feedback to guide his performance on conceptual level tasks."  Father also scored poorly on a test to assess problem-solving and planning ability. Additionally, his grip was tested, and his score showed "a significant moderate degree of impairment."  Father did better on a reading test, however, scoring at the "low average" level.

By late January 2024, the paternal great aunt and uncle in Michigan were having virtual visits with D.S.L., with plans to visit in person by spring 2024. These paternal relatives stated they had a dedicated commitment to adoption and were aware of D.S.L.'s unique needs and the high level of care required. DCFS recommended that family reunification services be terminated and that D.S.L. be moved to Michigan with the great aunt and uncle.

D.S.L.'s caregiver reported that, although Father had been consistent in attending occupational therapy sessions, he tended to remain somewhat withdrawn during the sessions, often focused on his phone rather than engaging in the sessions, and frequently relinquishing responsibility to the caregiver to practice interventions with the child. The occupational therapist further advised that Father had a difficult time understanding explanations of the therapy. As for Father's mother, D.S.L.'s caregiver noted that, although she would at arrive at appointments with Father, she did not participate in them. DCFS advised against unmonitored visitation for Father, maintaining that it was not in the best interest of ensuring D.S.L.'s physical and emotional safety and wellbeing.

On February 7, 2024, DCFS reported that D.S.L. had been hospitalized since January 30, 2024. A mass on his scalp was discovered as were lesions on his skin, with high possibility for malignancy. He had undergone some diagnostic testing and would need numerous biopsies. The physician who met with Father in the hospital stated that he appeared confused throughout their conversation, and felt that Father was not able to understand the discussion regarding the child's medical needs and the required procedures. She expressed concerns regarding Father's ability to care for a medically fragile child. Given these issues, the physician believed that it was not appropriate to try to obtain consent from Father (or Mother) for D.S.L.'s medical procedures. Instead, DCFS sought

approval from the juvenile court, and on February 7, 2024, the court authorized the requested medical treatment.

The DCFS social worker spoke with Father's individual therapist in February 2024. Although the therapist confirmed that Father had been in counseling since November 2023, he believed that Father was not benefiting from the sessions. He stated that Father was guarded and did not share anything during the sessions. The therapist also expressed concerns regarding Father's limited ability to understand D.S.L.'s health issues. He did not believe that Father was capable of caring for a child with high medical needs, as Father did not demonstrate an ability to process and understand relevant information. The therapist was concerned that, although Father may appear compliant with receiving services, an outcome of placing D.S.L. with Father would endanger the child's safety and well-being.

**Review hearing**

The six-month review hearing (§ 366.21, subd. (e)) was held on February 9, 2024.

D.S.L.'s pediatrician was called to testify. She noted that the child had just recently been diagnosed with Langerhans Cell Histiocytosis (LCH), a "type of reactive process in the body" that would need "about a year" of chemotherapy to treat. The condition would likely require weekly oncology appointments. Those appointments would be in addition to his speech therapy, physical therapy, occupational therapy, neurology, rehabilitation specialist, and orthopedic surgery appointments. The pediatrician acknowledged that D.S.L. could receive treatment for LCH in another state.

Due to the recent LCH diagnosis, D.S.L. was even more medically fragile than previously believed. There was a strong chance that D.S.L. would be affected by the chemotherapy, leaving him unable to tolerate food or liquids, and also prone to infections, requiring further hospitalization.

11

The pediatrician further testified how, due to his traumatic brain injury, D.S.L. was at risk for developing behavioral problems as he aged, including major depressive disorder or oppositional defiant disorder. He was also more at risk for seizures.

Following the completion of testimony, DCFS and minor's counsel argued in favor of termination of reunification services, while counsel for each parent urged continuation of services. Father's counsel additionally requested unmonitored visitation. Counsel stated that, because of family support, Father's plan was to move to Michigan with D.S.L.

In ruling, the juvenile court noted that "this is not an easy case." The court found, by clear and convincing evidence, that DCFS provided or offered reasonable services. The court recognized that Father had made strong efforts, was in substantial compliance with his case plan, and was very attentive to his son. The court emphasized, however, that medical professionals, Father's own therapist, and others determined that Father was incapable of providing adequate care for D.S.L., with his "very, very severe medical needs." On this basis, the court found, by clear and convincing evidence, that there was no substantial probability that D.S.L. may be returned to Father within the next six months, and terminated his reunification services. The court, however, expressed a hope that D.S.L. would eventually be placed with relatives in Michigan, and that Father "will be able to be involved in that at some point." Reunification services for Mother were also terminated.

At the close of the hearing, the court found that it was in the best interest of D.S.L. "to set a hearing to select a permanent plan of adoption, guardianship, or other planned permanent living arrangement with a relative or foster care provider pursuant to Welfare and Institutions Code section 366.26."

Father timely filed a notice of intent to file a writ petition, and thereafter timely filed this petition for extraordinary writ. DCFS filed a brief opposing the petition, which minor's counsel joined. Following

receipt of these briefs, amici curiae filed a brief in support of Father's petition, and DCFS and minor's counsel both filed responses in opposition.

## DISCUSSION

Father challenges the juvenile court's order terminating reunification services and setting a section 366.26 permanency planning hearing. He makes two primary arguments in his petition. First, he contends that the juvenile court erred in finding there was no substantial probability that D.S.L. could be returned to his care within the next six months. Second, he argues that the juvenile court abused its discretion when it declined to liberalize his visits.

## I. No substantial probability of return

### A. The ruling is supported by substantial evidence.

Although nearly 18 months had elapsed since the initial filing of the section 300 petition in this matter, the hearing held in February 2024 was the first review hearing held under section 366.21. At the initial six-month review hearing, "the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.21, subd. (e)(1).)

If the juvenile court finds a substantial risk of detriment, as it did here, and if the child was under three years of age on the date of initial removal, as D.S.L. was, the court "shall continue the case to the 12-month permanency hearing" if it "finds there is a substantial probability that the child . . . may be returned to their parent or legal guardian within six months or that reasonable services have not been provided." (§ 366.21, subd. (e)(3).) If reasonable services were provided—as found by the juvenile court here—and the court does not find a substantial probability of return, it may properly terminate

13

reunification services. (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845.)

Father contends that the juvenile court erred in finding there was not a substantial probability that D.S.L. may be returned to him within the next six months, and thereby terminating reunification services and setting a section 366.26 hearing. We review the juvenile court's finding of no substantial probability for substantial evidence. (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028; *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) We do not reweigh the evidence or evaluate the credibility of witnesses. (*Kevin R. v. Superior Court,* at p. 689; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) All inferences from the evidence are drawn in favor of the juvenile court's ruling, and the record is viewed in the light most favorable to the order below. (*Kevin R. v. Superior Court*, at pp. 688– 689.)

Substantial evidence supports the juvenile court's finding that there was not a substantial probability that D.S.L. may be returned to Father within the next six months. Although the record shows that Father made admirable efforts to reunify, his substantial compliance with reunification services was not the sole factor for the juvenile court to consider in making its decision. (See *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 181 ["the court may take all of the evidence into consideration" in determining substantial probability of return].) Instead, the juvenile court properly considered a range of evidence, focusing on the issue of whether Father demonstrated a capability to provide adequate care for D.S.L. (See *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424–1425 [parent's "demonstrated ability to safely care for the child" is a proper consideration]; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 ["[T]he purpose of any dependency hearing is to determine and protect the child's best interests"].)

In the nearly 18 months since initial removal of D.S.L., Father never progressed beyond monitored visitation with D.S.L. The reasons

for this were centered around D.S.L.'s safety and well-being. While Father was affectionate with D.S.L. and, at times, attentive, he never appeared to grasp the precariousness of D.S.L.'s health or the commitment necessary to care for him. In repeated reports, numerous individuals expressed concerns about Father's lack of understanding regarding D.S.L.'s severe, life-long medical problems and the work required to parent an unusually fragile young child. Among other examples, the MAT assessor reported that Father "demonstrated an inability to safely care for a high risk and medical needs baby"; D.S.L.'s caregiver reported that Father struggled to maintain a schedule of the child's many appointments and did not engage in sessions, and was concerned that Father did not adequately comprehend D.S.L.'s health risks and needs; and the physician who communicated with Father when D.S.L. was hospitalized in early 2024 noted that Father appeared unable to understand D.S.L.'s medical needs and the recommended procedures.

These sentiments were echoed in the neurocognitive and psychological report prepared by the court-appointed psychologist, who expressed "grave concerns" about placing D.S.L. with Father. In addition, D.S.L.'s pediatrician reported that Father did not pay attention or show concern during medical visits, and did not understand the severity and extent of the child's diagnosis and lifelong health issues. Furthermore, Father's individual therapist did not believe that Father was capable of caring for a child with high medical needs, and believed that placing D.S.L. with Father would endanger the child's safety and well-being. Given this wide-ranging evidence of Father's inability to care for D.S.L., we cannot reasonably say that the juvenile court's order was not supported by substantial evidence.

This conclusion is further compelled by the evidence presented at the six-month review hearing, showing that D.S.L.'s severe medical issues continued to compound. His pediatrician testified that, due to the recent diagnosis of LCH, D.S.L. was "even more medically fragile"

15

than when he suffered only from the complications of traumatic brain injury. D.S.L.'s well-being was likely to be affected by the approximate one-year course of chemotherapy that he was to receive, and he could need further hospitalization. He would also require frequent oncology appointments, on top of the many appointments he already attended due to his brain injury. Thus, D.S.L.'s severe medical issues would require an even more stringent adherence to scheduling and attentiveness to medical issues than they previously had. Due to this unfortunate situation, the likelihood that Father could provide adequate care became even more remote.

We are also mindful of the fact that, by the time of the six-month review hearing, a substantial amount of time had elapsed. "For a child under three years of age at the time of removal, as [D.S.L.] was, reunification services are presumptively limited to six months." (*Tonya M. v. Superior Court, supra,* 42 Cal.4th 836, 843; see also § 361.5, subd. (a)(1)(B).) Given the delays in holding the six-month review hearing, Father was provided with nearly 18 months to demonstrate a sufficient capacity to provide adequate care for D.S.L. He was unable to do so.

In sum, although we recognize that Father made commendable efforts and has deep affection for D.S.L., those positives cannot be our sole consideration. The substantial weight of the evidence showed that Father was unable to safely care for such a medically fragile child as D.S.L. The determination that there was not a substantial probability that D.S.L. may be returned to Father within the next six months was thus supported by substantial evidence.

## B. The ruling was not based on inappropriate factors.

### 1. *Consideration of Father's limitations*

Father, joined by amici curiae, contends that the evidence regarding his ability to provide proper care for D.S.L. was based on inappropriate considerations.

Among other contentions, Father asserts that the evidence inappropriately contained considerations of Father's physical condition,

16

in violation of the Americans with Disabilities Act of 1990. (42 U.S.C. § 12101 et seq.) Father additionally contends that consideration of Father's limitations also violated well-established standards that "if a person has a physical handicap it is impermissible for the court simply to rely on that condition as prima facie evidence of the person's unfitness as a parent or of probable detriment to the child." (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 736; see also § 300, subd. (j) ["The Legislature further declares that a physical disability, such as blindness or deafness, is no bar to the raising of happy and well-adjusted children and that a court's determination pursuant to this section shall center upon whether a parent's disability prevents the parent from exercising care and control"]; § 361.3, subd. (a)(8)(B).)

This argument focuses on the claim that D.S.L. was not returned to Father's care because of concerns about Father's physical frailty. We note that consideration of a parent's disability is not per se improper in dependency proceedings, though the disability is viewed only "in light of the disabled parent's response to services and demonstrated ability to safely care for the child." (*Tracy J. v. Superior Court, supra,* 202 Cal.App.4th at p. 1425.) Regardless, Father's claim is not supported by the record. While reports by DCFS and others relating to Father's ability to care for D.S.L. at times mentioned Father's apparent lack of physical strength, physical limitation was not the primary issue. Rather, as noted above, in report after report, numerous individuals expressed concerns regarding Father's lack of comprehension regarding D.S.L.'s unusually high medical needs and the lifelong medical care he would likely require.

Moreover, and more importantly, there is no indication that the juvenile court based its ruling on an inappropriate consideration of Father's physical condition or other limitations. Instead, in making its ruling, the court stated, with regard to Father: "I am concerned about the medical professionals' opinions and your own therapist's opinion about what you are going to be capable of in connection with this child,

17

who . . . has very, very severe medical needs, and I have to think about that in making my determination. . . . I feel I have to rely on what the medical professionals are telling me about this child's medical care." The court's focus was on D.S.L.'s medical needs and care, and whether Father would be able to meet them. That focus was proper. (See *In re Marriage of Carney, supra,* 24 Cal.3d 725, 736 [the court should "carefully determine whether the parent's condition will in fact have a substantial and lasting adverse effect on the best interest of the child"].)

Notably, neither amici curiae—who acknowledge that they have not reviewed the record in the matter, only the briefing—nor petitioner examine the situation as presented. D.S.L. is not a healthy child or even a child with merely challenging limitations. Instead, the evidence showed that D.S.L. is an unusually medically fragile child, requiring a much higher level of care than could normally be expected with a child his age. This unique situation was the crux of the juvenile court's ruling, as it found that Father is "not able to care for the child with severe medical needs."

Indeed, Father's limitations were not viewed as a universal detriment, as if he were incapable of providing any parental role for any child. Rather, his limitations were analyzed specifically with regard to his ability to provide sufficiently safe care for D.S.L. (See *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788 ["[t]he issue" at the review hearing is whether placing the child in a parent's care "represents some danger to [the child's] physical or emotional well-being"].) As noted above, numerous individuals reported that Father lacked understanding of D.S.L.'s health issues and needs. These reports continued from initiation of the case up through the review hearing at issue. Despite the passage of 18 months, the evidence showed that Father's comprehension of the level of care necessary to parent D.S.L. did not meaningfully improve over time. This lack of understanding was exacerbated by Father's apparent disregard for

18

attaining the necessary know-how, as shown by his failures to engage in D.S.L.'s treatment sessions or pay attention during medical visits.

While amici curiae raise compelling points regarding how disabled parents must be not be given a lesser opportunity to reunify, the evidence in this case shows that Father was not placed at an unfair disadvantage. Amici curiae's arguments ultimately fail, as they do not grapple with the unique situation presented here involving Father's inability to safely parent such a medically fragile young child. The juvenile court, in contrast, properly focused on the specific circumstances of this case.

### 2. *Alleged comparisons*

Father's next argument—that there was an improper comparison of the high level of care provided by D.S.L.'s current caregivers versus what could be provided by Father—fails for a similar reason as his previous one. It is not supported by the record.

Although D.S.L.'s pediatrician testified that the caregivers were providing "excellent" care, there is no indication that that observation formed a basis for the juvenile court's ruling. Nor was there any prejudicial impropriety with the court's hypothetical statement near the end of the hearing: "I just believe that, at the end of the day, what is best for this child is to be with relatives in Michigan, potentially. And I am hoping . . . that [Father] will be able to be involved in that at some point." The statement merely expressed a belief of what may be best for D.S.L. and a hope that Father could be involved. Again, it was not the basis for the juvenile court's ruling.

### 3. *Support system and services*

Father additionally argues that his support system was not explored as a means to assist in D.S.L.'s safe return. Amici curiae take this argument a step further, asserting that Father was not provided with adequate reunification services tailored to his needs.

We note that Father did not object to the juvenile court's finding that reasonable services were provided, or otherwise argue at the

19

subject hearing that possible supports were not adequately considered. We thus consider the issues forfeited. (See *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1110 [issue of inadequate reunification services waived by failure to object]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885 [asserted error in reasonable services finding waived by failure to object].) Amici curiae's argument about inadequate services does nothing to change this conclusion. (See *People v. Hannon* (2016) 5 Cal.App.5th 94, 105 ["Courts generally do not consider new issues raised in amicus curiae briefs"]; *Crump v. Appellate Division of Superior Court* (2019) 37 Cal.App.5th 222, 251, fn. 11 [accord].)

Even if the issues were properly raised, however, we would find no grounds for reversal. A finding of reasonable services is reviewed for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) The appellate court views the evidence and reasonable inferences in the light most favorable to the juvenile court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) In analyzing a reasonable services finding, the court "recognize[s] that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

The juvenile court's finding of reasonable services was supported by substantial evidence. Father's case plan included monitored visitation, parenting classes for special needs children, individual counseling, and attendance and participation in D.S.L.'s appointments. In concurrently ordering the psychological and neurological report, the court's concern was how Father's "developmental and cognitive" abilities "may affect care for a child with high medical needs." The plan thus focused on services that would provide Father with the opportunity to learn to care for a fragile young child, and the record shows that these services were provided. In attending D.S.L.'s

appointments, for example, and in conjunction with his other services, Father had ample occasion to learn of D.S.L.'s medical needs and the level of care and attention required to best ensure his well-being. As already explained, however, after many months of attending appointments and receiving services, Father still demonstrated an inability to understand or provide an adequate level of care for D.S.L. Father does not show that the fault lay with the services.

Finally, Father, in his petition, contends that his mother was not considered as a potential support for him. The record demonstrates, however, that exploration of Father's mother as support *was* conducted by DCFS, and that examination revealed that she had an extensive child welfare history of her own. It is not realistic to assume that further exploration of Father's support system would have resulted in a more favorable outcome.

## II. <u>Visitation ruling</u>

Father's last argument is that the juvenile court erred when it declined to liberalize his visits from monitored to unmonitored at the six-month review hearing. We review the juvenile court's visitation order for an abuse of discretion. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.)

"Visitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) Nevertheless, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).)

Given the unique fragility of D.S.L.'s health, as well as the abundant evidence that Father was not able to adequately care for him, as discussed above, the juvenile court could reasonably find that unmonitored visitation would jeopardize D.S.L.'s safety. Father thus fails to show an abuse of discretion.

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion shall become final immediately upon filing.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.